# United States Court of Appeals
## For the First Circuit

No. 04-1285

UNITED STATES OF AMERICA,

Appellee,

v.

AUGUSTINE E. PESATURO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Circuit Judge,
Stahl, Senior Circuit Judge,
and Lipez, Circuit Judge.

William J. Cintolo, with whom Thomas R. Kiley, Nicholas
A. Kenney, and Cosgrove, Eisenberg & Kiley were on brief, for
appellant.
S. Robert Lyons, with whom Eileen O'Connor, Assistant
Attorney General, and Alan Hechtkopf were on brief, for appellee.

February 16, 2007

**LIPEZ, Circuit Judge**.  At the heart of this appeal is a complex regulatory scheme governing federal fuel excise taxes. Augustine Pesaturo was convicted by a jury on charges that he evaded such taxes, conspired with his employees to do so, and provided a false statement leading to a fraudulent tax return.  On appeal, he argues primarily that he was never liable for the taxes he allegedly evaded.  The relevant statute was amended in 1993, and the charged conduct occurred when the regulations implementing the statute were in a state of transition.  Nonetheless, we conclude that a jury could permissibly find that Pesaturo was liable for the taxes that underlie his conviction, and that he willfully failed to pay those taxes.  We also find Pesaturo's additional arguments meritless and therefore affirm.

## I.

Pesaturo owned and operated Covenant Oil ("Covenant"), a fuel delivery company that purchased fuel from "terminals" - fuel storage and distribution facilities supplied by pipeline or vessel. Covenant's employees loaded the fuel onto trucks and delivered it to customers who used the fuel to power trucks, heating and refrigeration units, and railroad cars, as well as in other applications.  In 1995 and 1996 Covenant was a small operation. Pesaturo managed the business with the help of one clerical worker and a handful of drivers to operate its three trucks.  Aside from

the storage tanks of these trucks, Covenant had no fuel storage facilities.

Covenant primarily distributed diesel fuels, including No. 1 diesel, No. 2 diesel (also referred to as home heating oil), and kerosene. While these three fuels differ only slightly in chemical composition, the methods for taxing them differed significantly. The government imposes a tax upon all three fuels when they are used to power vehicles on the road.[1] A tax is not imposed for off-road uses, such as powering farm equipment, heating homes, or operating the refrigeration and heating units that "piggyback" on trucks and railroad cars, known as "reefers." This case arises from the government's allegation that Pesaturo failed to pay taxes due on substantial amounts of fuel he sold during 1995 and 1996.

During that period, No. 1 diesel was taxed upon its removal from a terminal. In practice, Covenant's suppliers included the federal excise tax in the price of No. 1 diesel and remitted the tax to the government, much like a gas station collects gasoline taxes from consumers at the pump. Customers who used the No. 1 diesel in off-road applications could file for a refund of the tax directly from the government. The price of home heating oil and kerosene purchased at a terminal did not include federal excise taxes. Home heating oil, which is intended for off-

_____

[1] The tax rate at the time was 24.4 cents per gallon.

road use, was dyed red to alert buyers and inspectors to its tax-free status and to deter unscrupulous sellers from selling it for on-road use without collecting the tax and remitting it to the government. Kerosene was not dyed out of concern that the dye would impair the function of unvented space heaters commonly run on kerosene. Instead, most terminals required their customers to sign exemption forms accepting responsibility for paying the excise taxes directly to the government if the kerosene was subsequently sold for on-road use.[2]

Because all three fuels could power vehicles on the road, and companies like Covenant only paid the tax-inclusive price for No. 1 diesel upon purchase from a terminal, an unscrupulous company had incentives to mix No. 1 diesel with kerosene (which was cheaper to obtain because its price at the terminal did not include the excise tax) and to sell the resulting mixture as fully taxed No. 1 diesel or as a blend of No. 1 diesel and kerosene on which the excise tax had been fully paid. Through this scheme, the unscrupulous seller could charge the tax-inclusive price for the fuel and keep the "tax" owed to the government on the kerosene

---

[2] At trial, employees of Sprague Energy (Covenant Oil's main supplier) testified that they operated their terminals using a card system. Each customer would drive up, insert a card into the pumping machine, and enter a pin number before being allowed to purchase fuel. If the card and pin number indicated that the customer had signed an exemption form, the customer could obtain kerosene at a price that did not include federal fuel excise taxes; otherwise, the customer would be charged a price that included these taxes.

portion of the blend.  Alternatively, sellers could undercut their competitors' prices for No. 1 diesel by blending untaxed kerosene with the taxed No. 1 diesel and collecting only a portion of the tax on the kerosene intended for on-road use, thus passing on some of the savings to the customer, while still turning a profit.[3] Even if the seller did not collect the tax on the kerosene intended for on-road use, it had an obligation to remit that tax to the government.

Pesaturo was indicted in 2002 on three counts of evading federal excise taxes on sales of fuel in 1996, in violation of 26 U.S.C. § 7201;[4] one count of conspiring with two Covenant drivers to evade excise taxes, in violation of 18 U.S.C. § 371; and two counts of filing materially false tax returns, for 1995 and 1996,

---

[3] Blending kerosene with No. 1 diesel is a common and legitimate practice.  Kerosene contains a lower concentration of wax in its composition than does No. 1 diesel; therefore, the mixture remains liquid at lower temperatures than pure diesel.  The gelling of No. 1 diesel can clog vehicle fuel lines at low temperatures, disabling vehicles. However, when one mixes kerosene with No. 1 diesel for on-road use, tax becomes payable to the government for the kerosene added to the blend.

[4] While Covenant was the primary entity responsible for the fuel tax, section 7201(1) applies to "[a]ny person who willfully attempts in any manner to evade or defeat any tax . . . or the payment thereof," thus encompassing the individual actions of those who contributed to Covenant's failure to pay these taxes. See, e.g., United States v. Tanios, 82 F.3d 98, 100 (5th Cir. 1996) (sustaining defendant's conviction for conspiracy to evade federal fuel excise taxes owed by a corporate entity with which he conducted business); United States v. Fawaz, 881 F.2d 259, 266 (6th Cir. 1989) (affirming the conviction of a gas station owner who evaded the retail dealer's excise tax on diesel fuel).

in violation of 26 U.S.C. § 7206(1). After an eight-day trial, a jury found Pesaturo guilty on all counts, except the final count of filing a false tax return for 1996, which the district court dismissed.[5] Pesaturo was sentenced to 24 months incarceration on each count, to run concurrently, and three years supervised release; he was ordered to pay a fine of $5,000, restitution of $108,878.61, and a $400 assessment. In support of the sentence, the district court found that tax was due on all kerosene purchased by Covenant in 1995 and 1996 that was not accounted for by sales to Covenant's largest customer, Merchant's Despatch Transportation (MDT), a railroad company that used the fuel in off-road applications.

On appeal, Pesaturo's primary argument is that the district court misconstrued the statute and regulations governing fuel taxes during the relevant period and that, as a matter of law, he was not liable for the taxes he allegedly evaded and conspired to evade. He asserts four additional claims of error: (1) the trial court impermissibly allowed the government to shift the burden of proof to him; (2) the evidence did not support a finding that he made false statements on his 1995 tax return; (3) the evidence was insufficient to establish a conspiracy; and (4) the court erred in calculating the tax loss on which his sentence was

_____

[5] The district court dismissed this charge at the government's suggestion because the government failed to present any evidence to support it.

based and, moreover, his sentence is unconstitutional because it was based on a fact – the amount of untaxed kerosene – that was neither charged by the grand jury nor found beyond a reasonable doubt by the petit jury.

## II.

Before addressing the arguments that Pesaturo makes on appeal, we must explain the regulatory regime that governed the payment of excise taxes on sales of No. 1 diesel and kerosene from 1994 to 1996, the period covered by the indictment.

## A. Regulatory Overview

The government has historically imposed an excise tax on fuel used in motor vehicles driven on public roads. Concerned about tax evasion,[6] Congress amended the statute governing fuel excise taxes in 1993. In part, these amendments added diesel fuels to the fuels on which federal excise taxes are collected upon their removal from a refinery or terminal by bringing them under 26

---

[6] The Department of Treasury noted that:

Congress has found that considerable evasion may be occurring under the pre-1994 taxing structure. See Shortfall in Highway Trust Fund Collections: Hearing before the Subcommittee on Investigations and Oversight of the House Committee on Public Works and Transportation, 102d Cong., 2d Sess. (1992). Congress sought to correct the weaknesses of pre-1994 law by amendments made to the Code . . . .

58 Fed. Reg. 63,069 (1993).

U.S.C. § 4081 (1994).[7]  This effectively moved the point of taxation further back in the distribution chain, away from the many small-scale wholesalers like Covenant and toward the less numerous terminals and refineries.[8]  Sales of kerosene, however, did not become subject to tax upon removal from a refinery or terminal until 1998.[9]  During the transitional period between the 1993 amendments and this 1998 decision on the taxation of kerosene, Congress continued to study whether kerosene should be taxed at the terminal.  In the meantime, kerosene was exempt from § 4081's

---

[7] Section 4081 states, in pertinent part, "There is hereby imposed a tax . . . (i) on the removal of a taxable fuel from any refinery, [and] (ii) the removal of a taxable fuel from any terminal . . . ."  26 U.S.C. § 4081(a)(1)(A) (1994).
    Section 4083 defines "taxable fuel," for the purposes of Section 4081, to include gasoline and diesel fuel, where "diesel fuel" is further defined, in relevant part, as "any liquid (other than gasoline) which is suitable for use as a fuel in a diesel-powered highway vehicle."  26 U.S.C. § 4083(a)(1), (3)(A)(i) (1994).

[8] Section 4091, which governed sales of diesel until the 1993 amendments, imposed the tax on the sale of diesel fuel "by the producer or importer thereof."  26 U.S.C. § 4091(a) (1992). Section 4092 further defined "producer" to include registered wholesale distributors.  26 U.S.C. § 4092(b)(1)(B)(i) (1992).  In practice, therefore, the tax was not imposed under the old regime until a registered wholesale distributor like Covenant sold the fuel to a retailer, or at the wholesaler's own retail pumps.

[9] Sales of home heating oil have never become subject to taxation upon removal from a terminal.  Instead, home heating oil is sold untaxed but dyed; if inspectors find dyed fuel in the tanks of vehicles traveling on the road, the owners of those vehicles are fined.

-8-

imposition of tax at the terminal by regulation,[10] and sales of kerosene were governed by the so-called "back-up tax," § 4041(a), which applies to sales of fuel that are exempt from § 4081.

Section 4041 imposes the federal excise tax at the point of sale to consumers, requiring sellers to collect the tax in some circumstances and buyers to pay the tax directly to the government in others.  In relevant part, § 4041 requires the tax to be imposed when fuel is: "(i) sold by any person to an owner, lessee, or other operator of a diesel-powered highway vehicle . . . or (ii) used by any person as a fuel in a diesel-powered highway vehicle."  26 U.S.C. § 4041(a)(1)(A)(i), (ii) (1994) (emphasis added).

Although § 4041 was not changed by the 1993 amendments, the relevant regulatory body – the Internal Revenue Service of the Treasury Department – responded to the Congressional action by changing the regulation implementing § 4041, expanding the conditions under which sellers of kerosene are liable for the federal excise tax.  The "old rule" specified that a "taxable sale" occurred if the "fuel is delivered by the seller into the fuel supply tank of the vehicle" or, if the fuel is not delivered

---

[10] 26 C.F.R. § 48.4081-1(c)(2)(i) (1996) states: "Effective April 1, 1996, diesel fuel means any liquid (other than gasoline) that, without further processing or blending, is suitable for use as a fuel in a diesel-powered highway vehicle, diesel-powered train, or diesel-powered boat.  However, diesel fuel does not include kerosene [or other enumerated fuels] . . . ."  Temporary regulations to the same effect were in place between 1994 and 1996.

directly into a fuel supply tank of a vehicle, if the purchaser "furnishes a written statement to the seller before or at the time of the sale" stating that the fuel will be used for a taxable purpose. 26 C.F.R. § 48.4041-5 (1996). In the absence of a "taxable sale," the buyer would be liable for the tax if the fuel was used on the road.

The "new rule" stated that § 4041 imposes a tax on, inter alia, "[a]ny diesel fuel on which tax has not been imposed by section 4081 . . . or [] [a]ny liquid other than gasoline or diesel fuel," that is delivered into "the fuel supply tank . . . of a diesel-powered highway vehicle." 26 C.F.R. § 48.4082-4(a)(1)(i), a(1) (1996). It is likely that the "diesel fuel" referred to in this regulation includes kerosene; however, even if it does not, kerosene is surely at least a "liquid other than gasoline or diesel fuel," and is thus subject to the tax.[11]

The new rule made the seller of the fuel "jointly and severally liable for the tax . . . if the seller knows or has reason to know that the fuel will not be used in a nontaxable use."[12] Id. at (a)(2)(ii). The new rule expanded the seller's tax

_____

[11] As discussed below, Pesaturo argues that 26 C.F.R. § 48.4081-1 (1996) excludes kerosene from the definition of "diesel fuel" for purposes of § 4081; however, we do not agree that the regulation extends to the definition of diesel fuel under § 4041.

[12] The new rule states, in pertinent part:

(1) In general. Tax is imposed by section 4041 on the delivery into the fuel supply tank of the propulsion

-10-

liability by (1) eliminating the requirement that fuel be supplied to the fuel tank <u>by the seller</u> or that the seller receive written notice from the buyer that the buyer intends to use the fuel on the road before the seller is liable for the tax, and (2) by making the seller jointly and severally liable if he knows or has reason to know that the fuel will be used on the road.

To summarize, the amendments tightened control over the taxation of diesel fuels by: (1) making No. 1 diesel taxable upon removal from a terminal, and (2) strengthening the regulation governing kerosene sales by broadening the circumstances under which sellers were liable for the tax and imposing joint and several liability on sellers where they had actual or constructive knowledge that the fuel would be put to on-road use.

---

engine of a diesel-powered highway vehicle . . . of --
(i) Any diesel fuel on which tax has not been imposed by section 4081;
(ii) Any diesel fuel on which a credit or payment has been allowed under section 6427; or
(iii) Any liquid other than gasoline or diesel fuel.
(2) Liability for tax --
(i) In general. The operator of the highway vehicle . . . is liable for the tax imposed . . . .
(ii) Joint and several liability of the seller. The seller of the fuel is jointly and severally liable for the tax imposed . . . if the seller knows or has reason to know that the fuel will not be used in a nontaxable use.

26 C.F.R. § 48.4082-4(a)(1)-(2) (1996).

## B.  Arguments Based on Statutory Provisions and Rules

On appeal, Pesaturo argues that the old rule governs his tax liability for sales of kerosene.  Alternatively, he argues that, even if the new rule applies, it should be read to require the seller to deliver the taxable fuel into the fuel supply tank of a vehicle before tax liability attaches to the seller and, except for the sales to the undercover IRS agents (accounting for roughly 1,000 gallons of liquid fuel, in total), the government's evidence involves only deliveries into fuel storage tanks.  Finally, Pesaturo argues that even if delivery into a fuel storage tank is enough to trigger tax liability on the seller of taxable fuel, the government provided insufficient evidence that Pesaturo knew or should have known that such sales were for on-road uses.

### 1.  The Old Rule or the New Rule?

In arguing that the old rule applies, Pesaturo points out that the regulation implementing § 4081 (26 C.F.R. § 48.4081-1(c)(2) (1996), supra note 10) excludes kerosene from the definition of "diesel fuel" between 1994 and 1998.  He also cites a 1994 notice in the Federal Register informing taxpayers that the IRS would not change the tax treatment of kerosene until it had determined how best to implement the tax on kerosene used on the road.[13]  Pesaturo interprets these texts as indicating that the

---

[13] This notice was described as follows: "Notice 94-72 (1994-2 C.B. 553) informed taxpayers that the IRS was reviewing this issue and would not change the treatment of kerosene until the issuance

taxation of kerosene would proceed precisely as it had before the 1993 amendments - through § 4041 as construed by the old rule. The government argues that the exclusion of kerosene from the definition of diesel fuel during this period serves only to exempt sales of kerosene from automatic taxation upon removal from a terminal, and not from the new regulations governing the "back-up tax."

We agree with the government that the better reading of these texts and Congress's intent is to exclude kerosene only from taxation upon removal from a terminal. Indeed, the regulation Pesaturo cites for the proposition that "diesel" does not include "kerosene," 26 C.F.R. § 48.4081-1(a) (1996), makes clear that this regulatory section only provides definitions "for purposes of the tax on taxable fuel imposed by section 4081," (emphasis added) and thus has nothing to say about whether "diesel" includes "kerosene" for the purposes of § 4041. Moreover, a further regulation arising from the 1993 amendments, 26 C.F.R. § 48.4041-0 (1996), tellingly entitled "Applicability of regulations relating to diesel fuel after December 31, 1993," provides that "[s]ections 48.4041-3 through 48.4041-17[14] do not apply to sales or uses of diesel fuel

---

of further guidance. The IRS is continuing its review of this issue. Accordingly, the final regulations do not treat kerosene as diesel fuel." 61 Fed. Reg. 10,450 (1996).

[14] These sections relate to the application of taxes on various types of fuel, including aviation fuel, and taxable liquid fuels with dual uses.

after December 31, 1993." The old rule is contained within that range. The regulation continues: "For rules relating to the diesel fuel tax imposed by section 4041 after that date, see §48.4082-4," the new rule. Id. In sum, the regulations provide no support for the proposition that "diesel" should be defined to exclude "kerosene" in relation to § 4041 and they unequivocally state that the "old rule" is inapplicable after 1993.

Finally, Congress adopted the 1993 reforms to plug the loopholes through which tax dollars were being siphoned away from the government and into the pockets of unscrupulous sellers. The principal tactic employed by Congress was to make sales of No. 1 diesel taxable at the terminal; however, as discussed above, the Internal Revenue Service also tightened the regulations that governed sales of fuel not taxed at the terminal, such as kerosene.

2.    Delivery into a Fuel Supply Tank

Pesaturo argues that, even if the new rule applies, Covenant was not liable for the tax because the seller incurs tax liability only when the seller delivers the fuel into the fuel supply tank of a diesel-powered vehicle. This argument relies on a misunderstanding of the text and purpose of the new rule. Under the old rule, sellers were liable for the tax upon delivery "by the seller into the fuel supply tank of the vehicle," (emphasis added). The new rule takes a different approach, as reflected in its text. Sellers are now jointly and severally liable for the tax if the

-14-

seller knew or had reason to know the fuel would later be "deliver[ed] into the fuel supply tank" by any party. The obligation to collect and remit the tax is no longer linked to the delivery by the seller into the fuel supply tank of the vehicle.

Pesaturo would have us ignore these subtle but significant changes to the text and urges us to read "delivery by the seller into the fuel supply tank of the vehicle" back into the new regulation. However, we find the government's interpretation of the regulation more persuasive both textually and in the context of the government's stated purpose of increasing fuel tax compliance. If fuel is delivered into a bulk supply tank temporarily for later use on the road and the seller knew or had reason to know of this later use, the seller is jointly responsible for the tax due. The objective is to ensure payment of taxes, and the new provision casts a wider net by extending the seller's liability to uses of which he is aware even if they occur further down the supply path.[15]

---

[15] Pesaturo also argues that the district court should have applied the rule of lenity – interpreting an ambiguous statute in the light most favorable to the defendant – because of the transitional nature of the regulations during this period. Specifically, he argues that the court should have interpreted the new regulation to require delivery of the fuel into the fuel supply tank by the seller before a sale becomes taxable. However, we find the new rule regulating the taxation of kerosene unambiguous and we therefore do not entertain Pesaturo's argument for lenity.

3. Knowledge

Pesaturo argues that, even if the new rule applies and delivery into a storage tank does not insulate the seller from tax liability, the government presented insufficient evidence that Pesaturo knew or should have known how much, if any, of the fuel at issue would be used on the road.

We find Pesaturo's argument disingenuous. Direct testimony at trial established that Covenant sold No. 1 diesel mixed with 20%-55% kerosene (on which no tax was remitted to the government) to bulk storage tanks owned by three trucking company customers – JAG Enterprises, M&M Transport, and M. Korson & Company, Inc. – on 13 different occasions between May 1995 and March 1996. Although Pesaturo contends that all three companies had both on-road and off-road uses for fuel, representatives of all three companies testified that they believed the price they paid Covenant for fuel included the on-road tax. Also, representatives of Korson and JAG indicated that they bought different fuel from Covenant for their on-road and off-road uses. There is no reason to think that Pesaturo's customers would have paid the much higher tax-inclusive price for fuel they intended to use in nontaxable applications. They paid the tax because their on-road use of the fuel required it.

It is true that the jury was given no instruction that the regulation governing § 4041 required Pesaturo to know that

sales of kerosene would be put to on-road use.  Pesaturo failed to object to this omission from the jury instructions at the time of the trial, focusing instead on the judge's refusal to instruct the jury that the seller was only liable for the tax when the seller delivered the fuel into the fuel supply tank of a vehicle. However, any error on this point was harmless.  The jury was duly instructed that tax evasion required not just that a tax be due and owing, but that defendant "willfully attempt[ed]" to evade the tax. See 26 U.S.C. § 7201.  The jury could only find such willfulness if it also found that Pesaturo knew that the fuel sold to buyers such as Korson, JAG and M&M Transport would be used on the road.[16]

## C.  Burden-Shifting by the Government

Pesaturo argues that the government impermissibly shifted the burden of proof to him through a summary witness, Gary Lindahl, an IRS revenue agent who was unconnected to the case but who was present in the courtroom during most of the trial.[17]  Since

----

[16] The government offers an alternative basis for Pesaturo's tax evasion under 26 U.S.C. § 4081(b)(1) (1996), which imposes a tax on blended fuels.  Section 4041(a)(1)(B) says, "No tax shall be imposed by this paragraph on the sale or use of any liquid if tax was imposed on such liquid under section 4081."  There may be an argument that § 4041 was intended to apply exclusively to unmixed kerosene (since § 4081 imposes a tax on blended kerosene). However, this argument was not raised, and thus we assume for our purposes that § 4041 applies to blended kerosene on which no tax was actually paid.  We also do not reach the merits of the government's argument basing Pesaturo's liability under § 4081 because the evidence supports Pesaturo's liability under § 4041.

[17] Lindahl testified that he had been present for "99 percent" of the testimony; he had missed part of one witness's testimony but

-17-

Covenant's records indicated no sales of kerosene, Lindahl used evidence from the trial to calculate the amount of kerosene Covenant could have sold for on-road use. Lindahl began with the amount of kerosene purchased by Covenant and subtracted kerosene sales to MDT (Covenant's largest customer, who used all of the fuel it purchased from Covenant in off-road applications). Because sales of kerosene to MDT were also not recorded, the amount of kerosene sold to MDT was imputed based on the total fuel sales to MDT and the testimony of several witnesses that Covenant blended kerosene into the fuel sold to MDT at a ratio of 30% kerosene to 70% No. 2 diesel. Kerosene, which has a lower viscosity than either No. 1 or No. 2 diesel, was added to the fuel to prevent the fuel from "gelling" in the fuel lines in cold temperatures. Although the witnesses agreed on this ratio, they disagreed as to whether or not Covenant sold blended fuel to MDT exclusively during the winter months. Those who testified that blended fuel was sold to MDT outside of the winter months noted that railcars were often sent through cold climates – across the Rocky Mountains, for instance – before they reached their destinations. As a result, the government assumed the 30:70 ratio for sales throughout the year. Since this would overestimate the gallons of kerosene sold to MDT if the fuel sold to MDT outside of winter was not blended, this approach resulted in a conservative estimate of the gallons of

had since read the transcript of that testimony.

-18-

kerosene unaccounted for by sales to MDT and therefore available for sale in taxable uses.

Pesaturo argues that, by subtracting non-taxable kerosene sales to MDT from Covenant's kerosene purchases to arrive at a figure of 358,740 gallons available for sale in taxable uses, the government impermissibly shifted the burden of proof to defendant to account for the legitimate sale of that fuel.[18] In response, the government characterizes its approach as the normal process of establishing a fact through the use of circumstantial evidence, and notes further that its estimate was necessitated by Pesaturo's own lack of accurate record-keeping. Indeed, Covenant's bookkeeper testified that Pesaturo instructed her to record all kerosene sales as sales of home heating oil, leading to the absurd accounting result that Covenant's records showed purchases – but no sales – of kerosene, notwithstanding that Covenant had no fuel storage facilities save the storage tanks of its three trucks.

The prosecution never argued to the jury that it had to find that the unaccounted-for kerosene was sold for taxable use because of the absence of records otherwise accounting for its sale. Instead, the prosecution noted the amount of unaccounted-for

---

[18] Pesaturo's trial counsel urged the judge to issue a curative instruction to the jury, reminding the jurors that the government has the burden of proving each and every fact necessary to establish the alleged crime and that there is "no burden on the defendant to come forward with any evidence at all." The judge refused, stating: "I think I've covered it."

kerosene, asked the rhetorical question "where did the rest go?", and answered the question by pointing to the evidence.[19] Furthermore, the judge carefully instructed the jury:

> The burden of proof rests with the government. A defendant has no burden to prove that he is not guilty of what is charged. The burden is always with the government to prove that he is guilty of what the government charges him with. . . . The government must establish each element of the offense charged by proof that convinces you and leaves you with no reasonable doubt.

We agree with the government that there was no impermissible burden shifting in this case.

## D. Materiality of the Adjustments to Pesaturo's Tax Return

Pesaturo challenges the jury's determination that he willfully made a material false statement regarding Covenant's 1995 tax return in violation of 26 U.S.C. § 7206(1). The government's burden under this statute is to prove the following elements:

> (1) that the defendant made or caused to be made, a federal income tax return for the year in question which he verified to be true; (2) that the tax return was false as to a material matter; (3) that the defendant signed the return willfully and knowing it was false; and (4)

_____

[19] The prosecution's argument continued:

Well, the evidence shows where it went. . . . You heard testimony from David Genarro from Korson [Trucking]. He was purchasing diesel fuel. He owned a trucking company. Diesel fuel, by definition, is on-the-road fuel. Yet, he received kerosene with that diesel fuel. You heard testimony from JAG, James Gasbarro, he was purchasing diesel fuel, and he received kerosene. Ladies and gentlemen, you can look at the tickets. It shows kerosene being purchased. This was diesel fuel being sold to trucking companies for use in their trucks.

> that the return contained a written declaration that it was made under the penalty of perjury.

United States v. Boulerice, 325 F.3d 75, 79-80 (1st Cir. 2003).

We review de novo whether there was sufficient evidence for the jury to find that Pesaturo's instruction to his accountant resulted in a materially false representation on Covenant's tax return. We will affirm if "'after assaying all the evidence in the light most amiable to the government, and taking all inferences in its favor, a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" United States v. Lavoie, 433 F.3d 95, 98 (1st Cir. 2005) (quoting United States v. O'Brien, 14 F.3d 703, 706 (1st Cir. 1994)).

Covenant's accountant testified that, when he found that the company's cash balance exceeded its receipts by $62,359, Pesaturo explained the discrepancy by claiming that the higher number reflected various cash sales for which receipts were unavailable. He further explained that a commensurate amount of cash had been used to purchase fuel from Sprague Energy and thus both sales and cost of goods sold should be adjusted to reflect these cash transactions.

Pesaturo offered no documents supporting the cash purchase of kerosene. Moreover, representatives of Sprague Energy testified at trial that the company rarely sold fuel on a cash

-21-

basis and only to customers whose credit-worthiness was at issue; further testimony established that Covenant's credit-worthiness was not questioned by Sprague during this period. In addition, both the government and Pesaturo stipulated at trial that "it was not the policy or practice of Valero Energy Corporation [Covenant's other fuel supplier] to accept cash . . . for payment."

Based on this evidence, a reasonable jury could have found that Pesaturo, alerted to the existence of unaccounted-for cash in Covenant's account, fabricated cash purchases to inflate Covenant's cost of goods sold in a misguided attempt to neutralize the extra receipts discovered by his accountant. The correct adjustment would have been a $62,359 adjustment in sales with no adjustment to cost of goods sold. However, that would have increased Covenant's tax liability, which Pesaturo wanted to avoid.

## E. Sufficiency of Evidence on the Conspiracy Charge

Pesaturo also argues that the government presented insufficient evidence to support the conspiracy charge. To prove liability under 18 U.S.C. § 371, the government must show that "two or more persons conspire[d] either to commit any offense against the United States, or to defraud the United States . . . and one or more of such persons d[id] any act to effect the object of the conspiracy." Pesaturo argues specifically that there was insufficient evidence of an agreement between him and the drivers who sold untaxed kerosene to undercover IRS agents. However,

Pesaturo errs in focusing solely on these sales.  The taxable sales were made to numerous customers, by multiple Covenant drivers, and over an extended amount of time.

Pesaturo insists that neither mere employment in a common business enterprise, see Ingram v. United States, 360 U.S. 672, 677-80 (1959), nor mere association with conspirators, see United States v. Gomez-Pabon, 911 F.2d 847, 853 (1st Cir. 1990), is sufficient to prove that an agreement existed on which the government could ground a conspiracy charge.  The government's evidence established more than mere association.  Testimony at trial established that Pesaturo controlled all business decisions at Covenant.  He scheduled fuel purchases and deliveries, set the price at which fuels were sold, marketed the company's products, and even instructed the bookkeeper in how to account for sales of different products.

While the government did not present evidence of an explicit agreement between Pesaturo and his drivers, we do not require evidence of an explicit agreement to ground a conspiracy conviction.  See United States v. Patrick, 248 F.3d 11, 20 (1st Cir. 2001) (noting the "well-established legal principle that a conspiracy may be based on a tacit agreement shown from an implicit working relationship").  Given the extent of the evidence regarding the tax evasion, the small size of Covenant Oil, and Pesaturo's

pervasive control over that enterprise, it is simply implausible to argue that the drivers were acting on their own.

## F.  Propriety of Pesaturo's Sentence

Under the Federal Sentencing Guidelines, Pesaturo's sentence was linked to the amount of tax loss attributable to his crimes.  See USSG § 2T1.1.  At his sentencing, the judge calculated the tax loss based on the taxes due on 358,740 gallons of kerosene bought by Covenant but not sold to MDT for use in its off-road applications,[20] and the tax loss resulting from the false inflation of Covenant's cost of goods sold on its 1995 tax return,[21] resulting in a total tax loss of $108,878.[22]

Pesaturo was sentenced in February 2004, before the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005).  Although Pesaturo's challenge to his sentence is difficult to decipher, we understand that it reduces to two points: (1) that the jury had to find the amount of tax loss beyond a reasonable doubt and (2) that, even if a court could make the tax loss finding, the court's calculation of the tax loss was erroneous.

---

[20] 358,740 gallons x $0.244/gallon (tax).

[21] $62,359 at a tax rate of 34%.

[22] In addition to basing the length of sentence on this figure, the court imposed restitution on Pesaturo in this amount.  The government sought additional restitution in the amount of $75,335 for the Commonwealth of Massachusetts for state taxes evaded; the judge refused this request.

Pesaturo bases his first argument on Booker. However, Booker does not help him. The sentencing flaw at issue in Booker was not judicial factfinding per se, but the application of the sentencing guidelines as mandatory rather than advisory. United States v. Antonakopoulos, 399 F.3d 68, 79-80 (1st Cir. 2005). To the extent we construe Pesaturo's argument as a challenge also based on the mandatory nature of the sentencing regime, we review for plain error because, despite his arguments to the contrary, Pesaturo failed to argue below that his sentence violated either Apprendi v. New Jersey, 530 U.S. 466 (2000), or Blakely v. Washington, 542 U.S. 296 (2004).

Under the plain error standard, a defendant ordinarily must "point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to [him] under the new 'advisory Guidelines' Booker regime." Antonakopoulos, 399 F.3d at 75. We further stated there that the "use of judicial fact finding . . . ordinarily cannot alone meet [this] standard," id. at 80. Pesaturo's only other possible plain error argument is his claim that the court erred in calculating the tax loss.

On this point, Pesaturo argues that the judge erred because there was evidence at trial that at least some of the fuel sold to Korson, JAG and M&M Transport was used in off-road applications. The government points out, however, that because the

amount of a tax loss is often uncertain, the Sentencing Guidelines "contemplate that the court will simply make a reasonable estimate based on the available facts." See USSG § 2T1.1 cmt. n.1 (2006); accord United States v. Hart, 324 F.3d 575, 578 (8th Cir. 2003) (finding no clear error where the trial court accepted the government's calculation of defendant's personal income where defendant failed to keep financial records); United States v. Bishop, 291 F.3d 1100, 1114-15 (9th Cir. 2002) (finding no error where the court based its sentence on the government's calculation of tax loss, which assumed "married filing jointly" rather than "married filing separately" tax status, used standard deductions rather than itemized deductions, and failed to deduct certain sums from defendant's income). Here, it was defendant's own lack of accurate record-keeping – he recorded no sales of kerosene although his records indicated that he purchased 662,105 gallons – that made the court's estimation necessary.

Even if we allowed that some of the kerosene was sold for purely off-road use, Pesaturo's sentence is unlikely to change. As the government points out, such non-taxable sales of pure kerosene would have had to account for upwards of 44% of Covenant's kerosene sales before his sentencing range would be affected. Since several witnesses testified that Covenant made no sales of pure kerosene and no witness testified to a single instance of such a sale, the judge's determination that Pesaturo should be sentenced based on

the full amount of the tax owing on all of its unaccounted-for kerosene sales is not plainly erroneous.

### III.

For the foregoing reasons, we affirm the conviction and sentence.  <u>So ordered</u>.