# United States Court of Appeals
## For the First Circuit

No. 13-1067
UNITED STATES OF AMERICA,
Appellee,

v.

ASTRID COLÓN LEDÉE,
Defendant, Appellant.

No. 13-1078
UNITED STATES OF AMERICA,
Appellee,

v.

EDGARDO COLÓN LEDÉE,
Defendant, Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado Colón,  U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Víctor M. Agrait-Defilló for appellant Astrid Colón Ledée.
Rafael F. Castro-Lang, with whom Nicolás Nogueras Cartagena was on brief, for appellant Edgardo Colón Ledée.
Charles Robert Walsh, Jr., Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and John A. Mathews II, Assistant United States Attorney, were on brief, for appellee.

November 5, 2014

**LIPEZ, Circuit Judge**. Appellants in this consolidated appeal are a brother and sister who were found guilty of multiple bankruptcy-related crimes designed to conceal the brother's assets and thereby avoid his obligations to creditors. The pair assert a host of trial and sentencing errors, none of which we find meritorious. Accordingly, we affirm both siblings' convictions and sentences.

## I. Factual Background

We present the facts as the jury could have found them, reserving additional detail for our analyses of appellants' claims.

In August 2002, Edgardo Colón Ledée, a plastic surgeon, and his sister, Astrid Colón Ledée, a bankruptcy attorney, collaborated on the transfer of Edgardo's oceanfront residence and office to Investments Unlimited ("IU"), a corporation wholly owned and controlled by Edgardo. Astrid drafted the deed and represented IU in the transaction as its president. The property, known as Málaga #1, had an outstanding mortgage of about $720,000, and the deed states that Edgardo sold it to IU to extinguish a $40,000 debt. Edgardo reported in his later filings in bankruptcy court that he leased the property from the corporation after the transfer, but the mortgage remained in his name and he continued to take the mortgage interest deduction on his personal tax return.

In May 2003, approximately nine months after the transfer of Málaga #1, Edgardo filed a voluntary petition for Chapter 7

bankruptcy, with Astrid serving as his attorney. At that time, he reported a debt of $100,000 to the Puerto Rico Treasury Department and faced about twenty malpractice suits. In the Statement of Financial Affairs ("SOFA") filed with his bankruptcy petition, Edgardo did not disclose his ownership of IU and Málaga #1 or that he had transferred the property to IU less than a year earlier.[1] In October 2003, Edgardo filed an amended petition whose supporting documents disclosed some additional properties, but he again failed to report the Málaga #1 transaction or his ownership of IU. The newly disclosed properties were heavily encumbered, and therefore did not add to the funds available for creditors. Astrid also signed the amended petition as Edgardo's legal representative in the bankruptcy. In both the original and amended petitions, Edgardo reported that he rented Málaga #1 from IU.

In November 2003, Edgardo lied under oath at a meeting of his creditors convened by the bankruptcy trustee, testifying that IU's stockholders lived in Chicago and were not related to him. He also reported that his only relationship with IU was an agreement to rent Málaga #1. Astrid, who attended the meeting as Edgardo's

---

[1] A Statement of Financial Affairs "is to be completed by every debtor." B 7 (Official Form 7) (04/13). The currently required information includes a list of property transfers, other than for business, "transferred either absolutely or as security within **two years** immediately preceding the commencement of this case." Id. (emphasis in original); see 11 U.S.C. § 521(a)(1)(B)(iii); Fed. R. Bankr. P. 1007(b)(1)(d). At the time Edgardo filed his Chapter 7 petition, the transfer period was one year preceding commencement of the case.

attorney, subsequently gave the trustee copies of commercial and residential leases that purported to show that Edgardo was renting Málaga #1 from IU. Based on Edgardo's filings and his representations at the creditors' meeting, the trustee found that there were no assets that could be liquidated to obtain funds to pay creditors and, on December 28, 2004, the trustee filed a Report of No Distribution.

In July and August 2006, during the pendency of the bankruptcy case and without notice to the trustee or bankruptcy court, Edgardo arranged for IU to purchase three pieces of property: a penthouse condominium known as Laguna Gardens V PHP (for $195,000), a building known as El Convento (for $490,000), and an adjacent lot next to El Convento identified as Antonsanti (for $68,000). Edgardo deposited cash into IU's bank account to fund the purchases, and Astrid paid the amounts due at the closings with manager's checks drawn on IU's account.[2] Astrid represented IU as its president for each of the three transactions, executing the deeds at each closing.

The deception began to unravel in late 2006 when a creditor's objection to the Report of No Distribution led the

---

[2] A "manager's check," also known as a "cashier's check" or "official check," is a check written by a bank on its own funds. See http://www.businessdictionary.com/definition/cashier-s-check.html. Such checks frequently are purchased by individuals for use in transactions requiring a secure method of payment. See http://www.robinsonsbank.com.ph/branchbanking.do?item_id=13545.

bankruptcy trustee to look more closely at the Málaga #1 property.

A realtor hired by the trustee discovered a "for sale" sign on the

property and, upon inquiring, learned that the seller was Edgardo.

The trustee's ensuing investigation revealed Edgardo's prior sale

of the property to IU and Astrid's role in the transaction,

prompting the filing of an adversary complaint in the bankruptcy

case on December 14. The trustee alleged in the complaint that

Edgardo had transferred the property to IU "with an actual intent

to hinder, delay or defraud" creditors, and he demanded that the

transfer be set aside and the property declared part of Edgardo's

bankruptcy estate. The trustee also sought sanctions against

Astrid, including damages and attorney's fees in favor of the

bankruptcy estate, and filed a notice in the real property registry

alerting third parties to the title claim against Málaga #1. Later

in the month, Astrid, as IU's president, signed annual reports for

the company for the years 2001 to 2005.[3]

Developments on two fronts quickly followed the filing of

the adversary proceeding. On January 5, 2007, Astrid withdrew from

the bankruptcy case and informed the bankruptcy court that she had

resigned her position as IU's president. Meanwhile, Edgardo

arranged a hurried sale of Málaga #1 to his girlfriend's parents,

with the closing taking place on January 6, Three Kings Day, a

---

[3] Astrid is listed as both president and treasurer in the reports. Angela Ledée, Astrid and Edgardo's mother, is listed as secretary.

significant holiday in Puerto Rico and an unusual day for such a transaction. Representing IU at the closing was Myrna Cintrón Estrada ("Cintrón"), Edgardo's cousin who served as his housekeeper and who had been newly installed as IU's president to replace Astrid. The sales price was $1.1 million, with $410,000 due from the buyers, Luis Santiago Aponte ("Santiago") and Yolanda Lebrón Matos ("Lebrón"), the latter figure being roughly the amount in excess of the outstanding mortgage on the property.

On January 8 and 12, manager's checks totaling $410,000 and made out to Investments Unlimited were deposited into IU's bank account, one in the amount of $205,000 on the earlier date and two for $102,500 on the later date. The larger check and one of the two smaller ones was obtained in Santiago's name, and the third check was obtained in Lebrón's name. On each of the two days the deposits were made, or shortly thereafter, Edgardo wrote four checks on IU's account for $51,250 each -- a total of eight checks[4] -- to the following individuals: Cintrón, Rafael Vaquer, Maria Bonilla Hernández, and Reynaldo Cordero Cintrón.[5] Each of the

---

[4] The FBI agent who testified to these transactions, as depicted in a summary chart, stated that he could not tell from a review of the documents who was authorized to sign checks on IU's account. However, abundant evidence indicated that Edgardo controlled IU and its funds.

[5] A slight variation occurred in one of the names. The first batch included a check made out to Rafael Vaquer, who testified that his wife is Edgardo's cousin. The second batch included one made out to Rafael Vaquer Camacho. Cordero, Cintrón's son, testified that his first name was spelled incorrectly on the

eight IU checks was used to purchase a manager's check in the same amount made out to the same individuals. Although the manager's checks contained endorsement signatures on the back, all four payees -- all family members of Edgardo -- denied receiving or endorsing the checks. All of the checks apparently were returned to the accounts of Santiago and Lebrón.

The adversary proceeding in Edgardo's bankruptcy case was resolved in March 2008. Edgardo and Astrid both accepted a Partial Settlement Agreement finding that Málaga #1 was property of the bankruptcy estate and requiring Edgardo to rescind the sale to Santiago and Lebrón. Edgardo further agreed that, if the proceeds from the trustee's sale of Málaga #1 did not suffice to pay all claims and costs,[6] the trustee could reactivate the adversary proceeding and seek the shortfall from sale of the properties Edgardo purchased in 2006 -- the Laguna Gardens V PHP, El Convento, and Antonsanti.[7] Edgardo subsequently filed amended schedules with

---

checks, and that it should have been spelled with an "i" (i.e., "Reinaldo") rather than a "y."

[6] The record indicates that all claims were paid in full. The trustee sold Málaga #1 in July 2008 for $1.45 million, with the bankruptcy estate receiving the sum over the then-current $700,000 mortgage. Edgardo personally paid some creditors with funds that were outside the bankruptcy estate.

[7] The agreement provided alternatively that, if the sale of Málaga #1 was insufficient to pay all creditors in full, Edgardo could choose to pay the deficiency with personal funds within thirty days to avoid sale of the three properties.

the bankruptcy court that reported, inter alia, his 100 percent ownership of IU.[8]

A year later, in April 2009, Edgardo and Astrid were charged in an eight-count indictment with various bankruptcy-related crimes, including conspiracy to conceal property belonging to Edgardo's bankruptcy estate and to fraudulently conceal and transfer his and IU's property with the intent to defeat the bankruptcy laws, as well as a substantive offense alleging that they concealed the property. See 18 U.S.C. §§ 371, 152(1) & (7). The first five counts cited the siblings' concealment of Edgardo's ownership interests in IU and Málaga #1 and the transfer of funds through IU to purchase the three properties in 2006. Count Six charged Edgardo alone with the fraudulent transfer of Málaga #1 in January 2007, in violation of 18 U.S.C. § 152(7). Count Seven charged him with laundering the proceeds of the Málaga #1 "sale" in January 2007 by converting the two $205,000 payments into eight cashier's checks payable to four individuals who "had no financial interest in the transaction or Investments Unlimited," in violation of 18 U.S.C. § 1956. Count Eight was based on conduct unrelated to the activities at issue in this appeal.[9]

---

[8] The bankruptcy case was closed in November 2013 after the trustee filed a final report, but it was reopened a few days later at Edgardo's request so that he could pursue a pending motion for a release of liens.

[9] Count Eight alleged that Edgardo had fraudulently transferred and concealed $75,000 in March 2002, before the

After a seventeen-day trial in January and February 2012, a jury found Edgardo guilty on Counts One through Seven and Astrid guilty on all five counts against her. Edgardo was acquitted of the fraudulent transfer alleged in Count Eight. The district court sentenced Edgardo to sixty months' imprisonment on each of Counts One through Six and seventy-two months' imprisonment on Count Seven, the money-laundering crime, all to be served concurrently. The court sentenced Astrid to a term of thirty-six months. The district court granted Astrid's request for release on bail pending appeal so that she could care for her ailing mother, conditioned on her mother's continuing need for help. Edgardo began serving his term in May 2013.

On appeal, appellants challenge both their convictions and sentences, each asserting multiple claims of error. They insist that the evidence was insufficient to support their convictions on some or all counts, and their common claims also include an objection to the district court's sixteen-level increase in their base offense levels under the sentencing guidelines. Edgardo includes among his claims a contention that the Partial Settlement Agreement, which brought Málaga #1 into his bankruptcy estate, constituted a waiver by the government of all charges based on conduct that was cured by his corrective actions. Astrid

transfer of Málaga #1 in August 2002 and the bankruptcy filing in May 2003.

includes among her claims a contention that the district court abused its discretion by denying her motion in limine to exclude prejudicial evidence relating to her own bankruptcy proceedings in 2000.

We address these arguments in turn, identifying in each instance whether the challenge is brought by Edgardo, Astrid, or both siblings.

## II. Edgardo: Government Waiver

Edgardo asserts that the Partial Settlement Agreement in his bankruptcy case effected a waiver by the government of the fraud, concealment, and money laundering charges lodged against him and, hence, entitled him to a judgment of acquittal on all counts. He frames this argument in terms of estoppel: the government is estopped from charging him criminally for concealing his ownership of Málaga #1 and IU and failing to disclose the transactions associated with them, because the trustee and bankruptcy court accepted the amended bankruptcy schedules that remedied any illegality in his prior conduct. In advancing this argument, Edgardo invokes both equitable estoppel and judicial estoppel.

### A. Equitable Estoppel

In general, courts apply equitable estoppel "to prevent injustice when an individual detrimentally and predictably relies on the misrepresentation of another." Nagle v. Acton-Boxborough Reg'l Sch. Dist., 576 F.3d 1, 3 (1st Cir. 2009). The doctrine is

used sparingly against the government, id., and a party seeking to equitably estop the government must show "at least . . . 'an affirmative misrepresentation or affirmative concealment of a material fact by the government,'" Shafmaster v. United States, 707 F.3d 130, 136 (1st Cir. 2013) (quoting Ramírez-Carlo v. United States, 496 F.3d 41, 49 (1st Cir. 2007)).  See also Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 60 (1984) (noting that "it is well settled that the Government may not be estopped on the same terms as any other litigant").  Here, Edgardo cites no affirmative statement by the trustee or bankruptcy court that the Settlement Agreement, and Edgardo's filing of amended schedules, would cleanse his prior unlawful conduct and protect him from criminal prosecution.

Edgardo suggests that the misrepresentation requirement is met through the bankruptcy court's allowance of his amendments, which he equates with a statement by the court that his conduct had become acceptable and, consequently, immune from criminal liability.  Edgardo, however, reads far too much into the bare fact that the bankruptcy court approved his amendments.  Under the Federal Rules of Bankruptcy Procedure, a debtor is permitted to amend a schedule "as a matter of course at any time before the case is closed."  Fed. R. Bankr. P. 1009(a); see also In re Hannigan, 409 F.3d 480, 481 (1st Cir. 2005).  Although a bankruptcy judge has the discretion to deny an amendment based on the debtor's bad

-11-

faith, see, e.g., Malley v. Agin, 693 F.3d 28, 30-31 (1st Cir. 2012),[10] the court's acceptance of amendments does not necessarily mean that the court has found no misconduct.  Where, as here, the offered amendments plainly benefitted creditors, the decision to accept the amendments could not possibly reflect any forgiveness by the court of the underlying conduct that required the amendments.  Hence, there was no misrepresentation to give rise to equitable estoppel.

## B. Judicial Estoppel

To establish judicial estoppel, a litigant must show that an opposing party is pressing a litigation position inconsistent with a position the party successfully asserted previously, and the new position would unfairly advantage that party if the court accepted it.  See Knowlton v. Shaw, 704 F.3d 1, 10 (1st Cir. 2013); Perry v. Blum, 629 F.3d 1, 9 (1st Cir. 2010).  Edgardo argues that the government's filing of criminal charges was inconsistent with

---

[10] We note that the Supreme Court has recently held that bankruptcy courts do not have "a general, equitable power . . . to deny exemptions based on a debtor's bad-faith conduct."  See Law v. Siegel, 134 S. Ct. 1188, 1196 (2014) (emphasis added). In Malley and the case it cites for the bad-faith principle, In re Hannigan, 409 F.3d 480 (1st Cir. 2005), we affirmed bankruptcy court orders that had relied on the debtors' bad faith to limit exemptions. See Malley, 693 F.3d at 30 (affirming surcharge against exempt property to offset fraudulent concealment of non-exempt property); In re Hannigan, 409 F.3d at 484 (affirming denial of amendment to homestead exemption as a sanction for bad faith).  Although Law appears to overrule Malley and Hannigan to the extent they limited exemptions based on bad-faith conduct, the Supreme Court's ruling does not restrict the bankruptcy court's discretion concerning amendments unrelated to exemptions -- as was the situation here.

the bankruptcy court's prior judgment to accept the Partial Settlement Agreement. He asserts that the settlement "benefited the Trustee and the creditors beyond what they would have obtained in an adversary proceeding." Hence, he argues that it is unfair to allow the government to prosecute him for fraud and concealment when, "by the time the indictment was filed[,] the schedules were correct and the estate complete, all with the blessing of the Bankruptcy Court."

Edgardo offers no case support, however, for his contention that the decision of a bankruptcy trustee or bankruptcy court to settle claims of misconduct in a bankruptcy case -- here, the concealment set forth in the adversary proceeding that was resolved with the Partial Settlement Agreement -- can estop the United States Attorney from subsequently filing criminal charges. The government emphasizes the requirement that the <u>same</u> party assert contradictory positions, and it insists that the Chapter 7 trustee and the United States Attorney are not interchangeable. <u>See</u> <u>United States</u> v. <u>Modanlo</u>, 954 F. Supp. 2d 384, 388 (D. Md. 2013) (stating that the United States Attorney "is not the same party as nor is it in privity with the U.S. Trustee," as the two officials "operate pursuant to completely different statutory purposes, powers, and interests," with distinct agendas). Indeed, courts have recognized in the preclusion context the folly of treating the government as a single entity in which representation

-13-

by one government agent is necessarily representation for all segments of the government. See United States v. Alky Enters., Inc., 969 F.2d 1309, 1314-15 (1st Cir. 1992) (holding that the Interstate Commerce Commission was not in privity with the U.S. Attorney General, and rejecting applicability of res judicata because the ICC "did not have statutory authority to represent the United States' interest" in the earlier proceeding); see also United States v. Hickey, 367 F.3d 888, 893 (9th Cir. 2004) (holding that the Securities and Exchange Commission and the United States Attorney were "not the same party" for purposes of collateral estoppel because, inter alia, the SEC "was not acting as the federal sovereign vindicating the criminal law of the United States" (internal quotation marks omitted)).[11]  Likewise, in the context of judicial estoppel, the government in all its guises cannot inevitably be viewed as a single party.

We need not compare the roles of the government parties in the proceedings at issue here, however, because, as explained above, there simply were no inconsistent positions taken.  In

---

[11] We have recognized that there are occasions when privity exists "'between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government.'"  Alky Enters., 969 F.2d at 1312 (quoting Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 402-03 (1940)).  However, "[t]he crucial point is whether or not in the earlier litigation the representative of the United States had authority to represent its interests in a final adjudication of the issue in controversy."  Sunshine Anthracite Coal Co., 310 U.S. at 403.

bankruptcy court, Edgardo secured a stay of the adversary proceeding and, assuming his compliance with the Partial Settlement Agreement, he gained protection from the possibility of sanctions under bankruptcy law. See, e.g., Law v. Siegel, 134 S. Ct. 1188, 1198 (2014) (noting that bankruptcy courts have "authority to respond to debtor misconduct with meaningful sanctions," including denying the debtor a discharge and ordering payment of attorney's fees and other expenses (internal quotation marks omitted) (citing Fed. R. Bankr. P. 9011(c)(2)). There was no reference in the agreement to the possibility of criminal charges. While Edgardo may have hoped his belated full disclosure would protect him from prosecution for fraud and unlawful concealment, "the government" -- whether in the persona of the bankruptcy trustee or the United States Attorney -- made no such commitment. Cf. United States v. Penn. Indus. Chem. Corp., 411 U.S. 655, 674 (1973) (holding that criminal prosecution may be barred if government misled defendant on whether charged conduct was criminal).

The sole settlement case on which Edgardo relies, Hoseman v. Weinschneider, 322 F.3d 468 (7th Cir. 2003), is inapposite. There, a trustee's declaratory judgment action was filed in bankruptcy court against a debtor who had failed to disclose his interest in a business during negotiations to settle an adversary proceeding. Id. at 471. The Seventh Circuit ruled that the trustee must adhere to the terms of a release and covenant not to

-15-

sue that had been executed as part of the settlement, rejecting the trustee's post-settlement attempt to secure the business interest for the debtor's bankruptcy estate.  Id. at 473-74.

The court's enforcement of the settlement in Hoseman is nothing like Edgardo's proposed bar of a criminal prosecution based on his bankruptcy settlement.  Not only did the agreement in Hoseman cover "all claims, known or unknown" and expressly protect the debtor from "any suit or action, at law or in equity," id. at 473 (internal quotation marks omitted) -- the very type of proceeding later filed by the trustee -- but it was the trustee who both signed the agreement and sought to escape from its limitations.  In addition, both the settlement and the court action in Hoseman were part of the bankruptcy proceedings.  Here, by contrast, the settlement agreement did not promise Edgardo immunity from prosecution in exchange for his surrender of Málaga #1, and two different arms of the federal government are implicated.

Finally, to the extent Edgardo's briefing can be construed to raise the doctrine of collateral estoppel, that effort too is unavailing.[12]  The bankruptcy court issued no ruling on the legality of Edgardo's conduct that could possibly implicate collateral estoppel, which bars relitigation of previously decided issues that were "essential to the [earlier] judgment," Ríos-

_____

[12] The district court expressly rejected collateral estoppel based on the settlement agreement as a bar to the criminal prosecution.  See Dkt. 302 (Order of Feb. 6, 2012).

-16-

Piñeiro v. United States, 713 F.3d 688, 692 (1st Cir. 2013). See, e.g., United States v. Tatum, 943 F.2d 370, 382 (4th Cir. 1991) (rejecting application of collateral estoppel in a criminal case based on bankruptcy discharge where "[t]he only adjudication necessary to the discharge . . . was approval of the settlement agreement as an acceptable compromise in the interests of the estate and its creditors"); cf. United States v. Modanlo, 493 B.R. 469, 475 (D. Md. 2013) (noting parties' acknowledgment that "collateral estoppel may bar the Government from litigating, in a criminal case, an issue previously litigated and decided in a civil bankruptcy proceeding").[13] The bankruptcy judge did not address the criminality of Edgardo's conduct, and whether Edgardo committed crimes was not "essential" to the decision approving the Partial Settlement Agreement.

In sum, Edgardo's settlement of the adversary proceeding provided no basis for a judgment of acquittal on the criminal charges subsequently filed against him.

**III. Edgardo and Astrid: Sufficiency of the Evidence**

Both appellants argue that the evidence adduced by the government was insufficient to support their conspiracy convictions

---

[13] As noted above, in a separate decision in a related proceeding, the judge in Modanlo rejected the defendant's contention that the government was collaterally estopped from criminally prosecuting him on the ground that the U.S. Attorney and the U.S. Trustee were neither the same party nor in privity with each other. See 954 F. Supp. at 388.

under Count One and the fraudulent transfer convictions under Counts Three through Five based on IU's acquisition in 2006 of Laguna Gardens V PHP, El Convento and Antonsanti. Edgardo additionally challenges the adequacy of the record to support his conviction for money laundering.

We apply de novo review to evidentiary sufficiency claims, examining whether "'a rational factfinder could find, beyond a reasonable doubt, that the prosecution successfully proved the essential elements of the crime.'" United States v. DiRosa, 761 F.3d 144, 150 (1st Cir. 2014) (quoting United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006)). We review the evidence, and all reasonable inferences drawn from it, in the light most favorable to the government. Id.

**A. The Conspiracy Count**

Both appellants claim that the evidence presented by the government at trial fell short of establishing a conspiracy between them to conceal and fraudulently transfer Edgardo's assets in violation of the bankruptcy laws. See 18 U.S.C. § 152(1), (7).[14] Astrid attempts to distance herself from Edgardo's conduct,

---

[14] Section 152(1) imposes criminal liability on any person involved in a bankruptcy case who "knowingly and fraudulently conceals . . . from creditors or the United States Trustee, any property belonging to the estate of a debtor." Section 152(7) imposes criminal liability on any person who "in contemplation of a case under title 11 [the Bankruptcy Code] . . . or with intent to defeat the provisions of title 11, knowingly and fraudulently transfers or conceals any of his property."

claiming that she had nothing to do with his actions before the transfer of the Málaga #1 property to IU and, hence, no conspiracy could have been in place at the time of that transaction. She also minimizes the significance of her role as president of IU, pointing to evidence that other individuals who held that position were uninvolved in the business and citing Edgardo's admission that IU was his alter ego. For his part, Edgardo complains that the government relied on improper hearsay evidence, and he asserts that the jury necessarily drew impermissible inferences from appellants' brother-sister relationship.

We find none of appellants' arguments persuasive. To sustain a conspiracy conviction, the government must show that the defendant knowingly agreed with at least one other person to commit a crime, intending that the underlying offense be completed. See United States v. Rodríguez-Adorno, 695 F.3d 32, 41 (1st Cir. 2012); United States v. García-Pastrana, 584 F.3d 351, 377 (1st Cir. 2009). The indictment charges a conspiracy that extended from about August 17, 2002 -- the date Málaga #1 was transferred from Edgardo to IU -- through mid-January 2007 -- following the Three Kings Day sale of Málaga #1, and after Astrid withdrew from the bankruptcy case and relinquished the presidency of IU. The record shows continuous collaboration by the siblings throughout that period. Both were involved in the 2002 transfer: Edgardo was the seller and, in effect, the buyer as well, and Astrid drafted the

-19-

deed and formally represented IU in the transaction as its president. When Edgardo filed for bankruptcy about ten months later without disclosing the sale of Málaga #1 or his ownership interest in IU, Astrid signed the bankruptcy petition as his attorney. Both attended the creditors' meeting in November 2003, when Edgardo falsely stated that IU was owned by Chicago investors. At that time, Astrid was still acting as IU's president (as well as Edgardo's attorney). Both also signed the amended bankruptcy schedules that continued to omit Málaga #1, and Astrid acted as IU's president in the multiple real estate deals that Edgardo initiated for IU in 2006. Later in 2006, Astrid signed five years' worth of IU's late annual reports.

This evidence of the siblings' activities is sufficient to permit a reasonable jury to conclude that the pair worked jointly throughout the period charged in the indictment to unlawfully conceal and transfer property belonging to Edgardo's bankruptcy estate. Appellants attempt to discount the import of their obvious collaboration by claiming a lack of proof that their actions were taken pursuant to a conspiratorial agreement. The government, however, need not produce "evidence of an explicit agreement to ground a conspiracy conviction." United States v. Pesaturo, 476 F.3d 60, 72 (1st Cir. 2007). Rather, "[a]n agreement to join a conspiracy 'may be express or tacit . . . and may be proved by direct or circumstantial evidence.'" United States v.

<u>Liriano</u>, 761 F.3d 131, 135 (1st Cir. 2014) (omission in original) (quoting <u>United States</u> v. <u>Rivera Calderón</u>, 578 F.3d 78, 88 (1st Cir. 2009)).

Based on the evidence described above, a jury reasonably could infer that the siblings had agreed to mislead the bankruptcy court about Edgardo's assets, including his ownership of IU, and took numerous steps designed to protect his resources, beginning with the transfer of Málaga #1 in anticipation of the bankruptcy filing.[15]  <u>See</u> <u>Rodríguez-Adorno</u>, 695 F.3d at 41-42 (noting that findings of knowledge and intent may rest on inferences drawn from the defendant's commission of acts furthering the conspiracy's purposes).  Accordingly, "there is no question that the government presented sufficient evidence to support appellant[s'] convictions." <u>Id.</u> at 43.[16]

**B. The Property Purchases in 2006**

Both appellants claim that judgments of acquittal should have been entered on the three counts charging them with the fraudulent transfers of Laguna Gardens V PHP (Count Three), El Convento (Count Four), and Antonsanti (Count Five), in violation of

---

[15] Hence, contrary to Astrid's assertions, the jury could properly find that the transfer of Málaga #1 was an overt act -- indeed, the first of many -- in furtherance of the conspiracy.

[16] Edgardo fails to develop his argument that the government relied on inadmissible hearsay evidence to support his conviction, and we therefore deem it waived. <u>See</u> <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).

18 U.S.C. § 152(7). Section 152(7) provides, in relevant part, that it is unlawful for a person, "with intent to defeat the provisions of [the Bankruptcy Code], knowingly and fraudulently [to] transfer[] or conceal[] any of his property." Appellants argue that the government failed to prove that the properties were purchased with funds belonging to the bankruptcy estate and, hence, the jury could not properly find that they acted with the intent to defeat the provisions of the Bankruptcy Code. Although the government acknowledges that, "[d]ue to Appellants' actions," the bankruptcy trustee could not exclude the possibility that the properties were purchased with post-petition earnings,[17] it asserts that § 152(7) does not demand that the fraudulent transfers at issue involve property of the bankruptcy estate.

We agree with the government, whose position is supported by the plain language of the statute. Unlike § 152(1), which addresses the concealment of "any property belonging to <u>the estate of a debtor</u>," 18 U.S.C. § 152(1) (emphasis added), § 152(7) covers the transfer or concealment of "<u>any of [a debtor's] property</u> or the property of [any] other person or corporation," <u>id.</u> § 152(7)(emphasis added); <u>see</u> <u>also</u> <u>United States</u> v. <u>Moody</u>, 923 F.2d 341, 346-47 (5th Cir. 1991) (noting the different language). Hence, although the transfer or concealment prohibited by § 152(7)

---

[17] Earnings "from services performed by an individual debtor after the commencement of the [bankruptcy] case" are not property of the estate. 11 U.S.C. § 541(a)(6).

-22-

must relate to a bankruptcy case -- i.e., it must be intended to defeat the provisions of the Bankruptcy Code -- the statute reaches beyond the bankruptcy estate itself. See United States v. Messner, 107 F.3d 1448, 1452 (10th Cir. 1997) (finding that "culpability will attach to a concealment of a person's own property if done for the purpose of defeating bankruptcy"); United States v. West, 22 F.3d 586, 590 (5th Cir. 1994) (holding that transfer of property outside the bankruptcy estate may provide basis for violation so long as it was "made knowingly, fraudulently, and in contemplation of a case under title 11 or with intent to defeat the provisions of title 11"); Moody, 923 F.2d at 347 (holding that "it is not necessary for the property to be an asset of the bankruptcy estate" so long as the defendant "has the intent at the time of the concealment or transfer to defeat the bankruptcy law" (internal quotation marks omitted)); see also 1 Collier on Bankruptcy ¶ 7.02[7][a][v] (16th ed. 2014) (noting that § 152(7) "covers the debtor's postpetition transfers or concealments, if taken with the requisite mental state, due to the level of interference with the administration of the debtor's bankruptcy estate that might arise from unregulated transfers").

The facts here illustrate why the fraud provisions of the Bankruptcy Code reach post-petition earnings. The jury reasonably could have found that Edgardo used post-petition earnings to fund IU's account -- a bankruptcy estate asset that should have been

-23-

disclosed initially -- and then used that IU account to acquire the three properties. It is inconceivable that such a blatant scheme to manipulate an estate asset could be insulated from criminal consequences simply because the funds at issue derived from post-petition earnings. Indeed, because IU should have been included in the bankruptcy estate, appellants presumably were obliged to bring to the trustee's attention any funds moving through the company. See 11 U.S.C. § 541(a)(7) (stating that property of the estate includes "[a]ny interest in property that the estate acquires after the commencement of the case").

Ultimately, however, appellants' challenge to their convictions under Counts Three through Five does not depend on the source of the funds used to purchase the three properties. Regardless of how the acquisitions were financed, the jury could have found that the transactions were deliberately structured to conceal assets from the trustee and, hence, were done "with intent to defeat the provisions of [the Bankruptcy Code]." 18 U.S.C. § 152(7). Appellants were therefore not entitled to judgments of acquittal on Counts Three through Five.

**C. Money Laundering**

Count Seven of the indictment charged Edgardo with money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i),[18] alleging

---

[18] To prove a violation of § 1956(a)(1)(B)(i), the government must establish:

that he knowingly transformed the proceeds of a property transfer that was unlawful under bankruptcy law, see 18 U.S.C. § 152(7), with the intention "to conceal and disguise[] the nature, location, source, ownership, and control" of the funds. Edgardo cursorily asserts that the government's evidence failed to show two necessary elements of the money laundering charge: that the money at issue was derived from unlawful activity and that he intended to unlawfully use or conceal the money.[19]

This claim warrants little discussion. The government sought to show that Edgardo committed money laundering when he converted the proceeds of the Málaga #1 "sale" in January 2007 into eight manager's checks payable to four of his relatives.[20] By that time, the trustee's investigation into the ownership of Málaga #1

---

(1) that [the defendant] knowingly conducted a financial transaction, (2) that he knew that the transaction involved funds that were proceeds of some form of unlawful activity, (3) that the funds were proceeds of a specified unlawful activity, and (4) that [the defendant] engaged in the financial transaction knowing that it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of such unlawful activity.

United States v. Hall, 434 F.3d 42, 50 (1st Cir. 2006).

[19] Edgardo makes a fleeting reference to the inadequacy of the government's proof that the charged financial transactions affected interstate commerce, see 18 U.S.C. § 1956(c)(4), but he fails to make a meaningful challenge to the sufficiency of the evidence on that element. We therefore do not consider the issue.

[20] As noted above, the government presented evidence that the funds eventually were returned to the accounts of the purported buyers, the parents of Edgardo's girlfriend.

was underway and the adversary proceeding had been filed. The circumstances of the closing itself bespoke a suspicious foundation: the unusual scheduling on Three Kings Day to finalize the sale, indicating urgency to get the deal done, with Edgardo's cousin/housekeeper serving as IU's president following Astrid's resignation. Notations on the eight IU checks that funded the manager's checks suggested that the four payees were connected to the company, but each denied any such relationship or receiving the funds. This evidence, taken in the light most favorable to the government, supports a finding that Edgardo initiated the sham sale of Málaga #1, and arranged the convoluted handling of the proceeds, to further his earlier fraudulent transfer and concealment of the property.[21]

The evidence was thus sufficient for the jury to find Edgardo guilty of unlawful money laundering.

### IV. Astrid: Rule 404(b) Evidence

Astrid claims that the district court erred in allowing the jury to hear evidence that she had failed to disclose that she owned the apartment in which she lived when she filed for personal bankruptcy in 2000. The government maintains that this evidence

---

[21] The government suggests that Edgardo may have structured the transaction in this way to provide the appearance that IU had outside investors, consistent with his false testimony at the creditors' meeting in November 2003. A reasonable jury also could have concluded that Edgardo was seeking to hide that the sale was a sham by using official checks to "pay" supposedly IU-related individuals for services performed.

was admissible to show the defendant's knowledge and intent with respect to the conduct alleged in the indictment, and thereby to rebut any suggestion that her involvement in the charged crimes was the product of neglect, mistake or accident.

Under Federal Rule of Evidence 404(b), evidence of prior bad acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," Fed. R. Evid. 404(b)(1), but such evidence may be introduced if it has "special relevance" and is not unfairly prejudicial, DiRosa, 761 F.3d at 153; Fed. R. Evid. 403.[22] We have explained that "special relevance" means the evidence "is relevant for any purpose apart from showing propensity to commit a crime." United States v. Doe, 741 F.3d 217, 229 (1st Cir. 2013). Among the permitted uses of prior acts evidence is to prove a defendant's intent or knowledge. Fed. R. Evid. 404(b)(2); DiRosa, 761 F.3d at 152. Even specially relevant evidence should be excluded, however, if there is "danger that it [would] sway[] the jury toward a conviction on an emotional basis" or would pose an undue risk of "an improper criminal propensity inference." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000).

To review the admission of prior bad acts evidence we ordinarily follow a two-step inquiry. We first determine whether

---

[22] Federal Rule of Evidence 403 provides, inter alia, that a court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

the disputed evidence is specially relevant under Rule 404(b) and, if so, we consider whether the evidence should nonetheless be excluded, pursuant to Rule 403, because of the risk of unfair prejudice. DiRosa, 761 F.3d at 153. We review the district court's rulings on this inquiry for abuse of discretion. United States v. Appolon, 715 F.3d 362, 373 (1st Cir. 2013).

Astrid argues that the government may not justify admission of the challenged evidence based on its need to prove her state of mind because she advised the court that she would not rely on any defense related to unfamiliarity with bankruptcy law. She further asserts that the evidence was substantially more prejudicial than probative.

Although Astrid predictably disclaimed reliance on ignorance of the Bankruptcy Code as a defense -- given her experience as a bankruptcy attorney -- that disclaimer does not account for a possible defense that she was an unknowing collaborator in her brother's scheme to defraud the bankruptcy court. See, e.g., United States v. Landry, 631 F.3d 597, 602 (1st Cir. 2011) (finding prior acts relevant to show intent or knowledge "because the evidence rebuts an innocent involvement defense"). Indeed, her briefing on appeal suggests such a strategy. She emphasizes her limited role in, and knowledge of, IU's business, points to Edgardo's admission that IU was his alter ego, and notes

that her response to the complaint in the adversary proceeding reported reliance on information provided by the debtor.

We have observed that "[e]vidence of uncharged fraud activity that is substantially similar to the activity underlying a charged fraud scheme often is admitted to show knowledge or intent to defraud with respect to the charged fraud scheme." United States v. Sebaggala, 256 F.3d 59, 68 (1st Cir. 2001). Here, the district court supportably concluded that the disputed evidence "relating to [Astrid's] own bankruptcy is substantially similar to the charged concealment of assets in the instant case." Order Adopting Report and Recommendation, at 7 (May 12, 2011) ("Order"). Hence, we agree with the court's finding that Astrid's decision not to pursue a defense based on unfamiliarity with the law "does not negate the probative nature of the proffered evidence as to [her] knowledge, intent and lack of mistake or accident." Id. at 6. The evidence thus easily survives the first step of our two-part inquiry.

The second step, requiring us to review the court's balancing of probative value against the risk of "unfair prejudice, confusing the issues, [or] misleading the jury," Fed. R. Evid. 403, only rarely leads to reversal of the district court's "on-the-spot judgment." Doe, 741 F.3d at 229 (internal quotation marks omitted). "[T]he balancing act called for by Rule 403 is a quintessentially fact-sensitive enterprise, and the trial judge is

in the best position to make such factbound assessments." United States v. Vizcarrondo-Casanova, 763 F.3d 89, 94 (1st Cir. 2014) (internal quotation marks omitted).

Here, the district court concluded that the "predominant effect" of the challenged evidence "would be to demonstrate knowledge or intent," and it found "little risk that the proffered evidence would be likely to elicit a strong emotional response from jurors and cause them to act irrationally based upon it." Order at 7. The court further noted that the evidence "might only incidentally indicate a propensity to commit wrongs," and it observed that any prejudice stemming from introduction of the evidence "may be mediated with a jury instruction." Id.

The court was correct to conclude that the evidence of an earlier bankruptcy violation would not engage the jurors' emotions in an unsettling way. However, given the substantial similarity between Astrid's prior conduct and the charged concealment, the district court may have understated the risk of a propensity inference linking the two bankruptcy cases. Yet, we have recognized that "all prior bad act evidence involves some potential for an improper propensity inference," Varoudakis, 233 F.3d at 122, and we frequently have observed that, "[b]y design, all evidence is meant to be prejudicial," DiRosa, 761 F.3d at 153 (alteration in original) (internal quotation marks omitted). Admissibility thus turns not on whether the evidence will harm the defendant, but on

whether it would provoke "an <u>undue</u> tendency to suggest decision on an improper basis."  Fed. R. Evid. 403 advisory committee's note (emphasis added).

The evidence in this case unmistakably showed that Astrid was a key player in Edgardo's bankruptcy proceedings and in most of the allegedly fraudulent transactions charged in the indictment. Hence, in all likelihood, the pivotal question for the jury in deciding Astrid's guilt was whether she was an informed and willing participant in Edgardo's endeavors.  The evidence of Astrid's conduct in her own bankruptcy was highly probative on that question, reinforcing the circumstantial evidence of knowledge that could be inferred from her conduct.  In concluding that the evidence was properly admissible, the district court did not neglect the potential for unfair prejudice to Astrid.  It took the risk into account and was prepared to give a limiting instruction to guard against the possibility of <u>unfair</u> prejudice.[23]

In these circumstances, we are satisfied that the district court acted within its broad discretion when it concluded that the probative value of the challenged evidence was not "substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

---

[23] Astrid's counsel ultimately decided not to request such an instruction.

## V. Edgardo and Astrid: The Guideline Loss Calculation

Both appellants argue that the district court erred in finding them responsible for losses exceeding $1 million and, based on that figure, imposing a sixteen-level enhancement in their base offense levels.  See U.S.S.G. § 2B1.1(b)(1)(I).  Guideline section 2B1.1 provides for varying increases in the base offense level for certain crimes, including fraud, depending on the amount of loss caused by the offense.  See id.; United States v. Appolon, 695 F.3d 44, 66 (1st Cir. 2012).  The appropriate amount ordinarily is "the greater of actual loss or intended loss," U.S.S.G. § 2B1.1 cmt. n.3(A), and the parties agree that in this instance "intended loss" is the appropriate measure.  We have described "'intended loss' in these circumstances [a]s a term of art meaning the loss the defendant reasonably expected to occur at the time he perpetrated the fraud."  United States v. Innarelli, 524 F.3d 286, 290 (1st Cir. 2008); see also Appolon, 695 F.3d at 67.

In calculating the intended loss, the district court combined the $1.4 million sale price of Málaga #1 in 2008 -- minus its outstanding mortgage (roughly $750,000) -- with the approximately $750,000 in cash payments for the three properties Edgardo purchased through IU in 2006 (Laguna Gardens V PHP, El Convento, and Antonsanti).  The sum, $1.4 million, fell within the guidelines range for a sixteen-level enhancement (more than $1 million, but less than $2.5 million).  We review de novo the method

chosen by the court to calculate loss, but we review only for clear error "[t]he mathematical application of this methodology." Appolon, 695 F.3d at 66.

Astrid's only argument, unsupported by any citations to authority, is that she cannot be held responsible for the amounts involved in the property transfers because she neither received nor intended to receive any pecuniary gain from those transactions. She relies solely on cases in which the enhancement was applied to defendants who did in fact realize some economic benefit, but those cases do not establish that a benefit is a required condition for the enhancement. Indeed, the guidelines provision also applies to crimes involving property damage or destruction, see U.S.S.G. § 2B1.1, where the defendant presumably would not benefit at all. Moreover, an application note to the guideline directs the court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined." Id. § 2B1.1 cmt. n.3(B). Hence, there is no requirement of personal gain as a condition of an enhancement under § 2B1.1(b)(1).

Edgardo argues that the district court used the wrong value for Málaga #1, and he claims the correct amount of loss for that property was the approximately $175,000 equity he held at the time he sought bankruptcy protection in 2003. In addition, he asserts that the cost of the three properties acquired in 2006

should not be part of the loss calculation, effectively reiterating his contention that those purchases are irrelevant to this case because they were funded with post-petition resources. Based on his preferred calculation -- i.e., a total of $175,000 -- the loss figure would trigger a ten-level increase in the base offense level. See U.S.S.G. § 2B1.1(b)(1)(F) (more than $120,000, but less than $200,000).

We can reject summarily Edgardo's assertion that the 2006 purchases should be excluded from the loss calculation, having already rejected Edgardo's attempt to insulate those purchases from criminal consequences based on his claim that they were purchased with post-petition earnings. As we have found that concealing the purchase of the three properties was properly charged as bankruptcy fraud, it necessarily follows that the purchase prices may properly be tallied for sentencing.

We also find no error in either the district court's decision to set the loss amount as the combined values of the concealed properties or its selection of the specific amount attributable to Málaga #1. The approach itself, focusing on the properties hidden from the bankruptcy estate, is a sensible way to appraise the harm attributable to Edgardo's unlawful concealment. Málaga #1 should have been in the bankruptcy estate from the outset, with its value available to pay creditors, and the use of IU to acquire the other properties provides a basis for also

-34-

treating their values as amounts Edgardo intended to deny creditors. In settling on the $1.4 million sale price for Málaga #1 (less the mortgage), the court chose the middle of three possible valuations; in addition to Edgardo's proposed $175,000, the court noted that Edgardo had listed the property at $1.8 million in the amended schedules he filed pursuant to the settlement agreement. The court's choice was both pragmatic and fair. The price at which the trustee sold the property provided objective evidence of value, and the court reasonably could presume that, when Edgardo concealed the property in 2003, he expected the oceanfront property to appreciate in value. See generally Appolon, 695 F.3d at 68-69 (noting that district court, in calculating loss, could properly rely on defendants' anticipation of changing real estate prices). There was no clear error in the court's judgment.

## VI. Edgardo: Money Laundering Sentence

The district court sentenced Edgardo to a sixty-month term of imprisonment on Counts One through Six -- the concealment charges -- and to a concurrent seventy-two month term for the Count Seven money laundering offense related to the sham sale of Málaga #1. Edgardo argues that the court improperly sentenced him on the money laundering count to a term beyond the five-year statutory maximum applicable to the underlying concealment offenses. He claims the court should have treated the money laundering as part of the concealment and, hence, not subject to greater punishment.

We see no basis for overturning the sentence imposed on Count Seven. Most importantly, the district court did not err in treating Edgardo's money laundering as distinct from his actions to conceal his ownership of Málaga #1. After orchestrating the transfer of the property to Santiago and Lebrón, Edgardo arranged the elaborate conversion of the three checks that comprised the sales proceeds into eight checks that contained false references to the payees' connections with IU. By disguising the proceeds of the sale with cashier's checks made out to recipients who would never receive the funds, Edgardo constructed a second level of concealment separate from the simple property transfer. Hence, he was properly subjected to punishment for the money laundering itself, and his sentence was therefore not limited to the five-year statutory maximum for the underlying bankruptcy fraud. See 18 U.S.C. § 1956(a)(1)(B) (specifying a statutory maximum of twenty years' imprisonment for money laundering); cf. United States v. Santos, 553 U.S. 507 (2008) (concluding that certain financial transactions may not be separately punishable as money laundering), superseded by statute, Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21 § 2, 123 Stat. 1617, as recognized in United States v. Lyons, 740 F.3d 702, 727 (1st Cir. 2014).[24]

---

[24] We note that Edgardo does not argue that his conviction for money laundering is unlawful based on the merger of the charged money laundering acts with the underlying bankruptcy fraud. See generally United States v. Grasso, 724 F.3d 1077, 1090-96 (9th Cir. 2013) (discussing the Supreme Court's holding in Santos that

Neither of the two cases on which Edgardo relies supports a different result. In <u>United States</u> v. <u>Woods</u>, 159 F.3d 1132 (8th Cir. 1998), the court found no abuse of discretion in the district court's decision to depart downward from the money laundering guidelines where the underlying offense was bankruptcy fraud. <u>See</u> <u>id.</u> at 1136. That decision does not say, however, that a district court <u>must</u> reduce a sentence in such circumstances. In the other case, <u>United States</u> v. <u>Smith</u>, 186 F.3d 290 (3d Cir. 1999), involving fraud in the operation of a lottery, the court held that a sentence imposed under the money laundering guideline was disproportionately harsh. <u>Id.</u> at 300. Not only have basic guidelines principles changed since <u>Smith</u>, <u>see</u> <u>United States</u> v. <u>Chilingirian</u>, 280 F.3d 704, 713-14 (6th Cir. 2002),[25] but that case also is distinguishable because the challenged money-laundering guideline there produced a much harsher sentence than otherwise would have applied, <u>see</u> <u>Smith</u>, 186 F.3d at 297 (noting the fourteen-level difference in base offense level). Here, the money-

---

certain types of unlawful financial transactions may not properly be punished independently as money laundering); <u>id.</u> at 1097-1104 (Berzon, J., concurring in part and dissenting in part). In so noting, we do not suggest that Edgardo has a plausible argument under <u>Santos</u>.

[25] The Sixth Circuit noted that "the <u>Smith</u> approach is no longer relevant" after an amendment to the Guidelines Manual removed the sentencing judge's discretion to pick "'the guideline section most applicable to the nature of the offense conduct.'" <u>Chilingirian</u>, 280 F.3d at 714 (quoting U.S.S.G. app. A (1999)); <u>see also</u> U.S.S.G. app. A (2000); <u>id.</u> app. A (2012).

laundering guideline on which the district court relied prescribes only a two-level increase in the base offense level.  See U.S.S.G. § 2S1.1(a)(1), (b)(2)(B).

In sum, we find no error in the sentence imposed on the money-laundering count.

## VII. Edgardo: Procedural and Substantive Sentencing Error

Edgardo claims that his seventy-two-month sentence was procedurally flawed because the district court failed to properly weigh mitigating factors, and he also challenges that term of imprisonment -- twice the length of his sister's -- as unjustifiably harsh.  We employ the deferential abuse-of-discretion standard in evaluating both the court's balancing of the sentencing factors and the substantive reasonableness of the district court's sentencing judgment.  United States v. Suárez-González, 760 F.3d 96, 101 (1st Cir. 2014).

## A. Procedural Error

Edgardo argues that the court erred by giving insufficient weight to the many reasons he offered for leniency, including his mother's poor health and her need for help, his eight employees' dependence on their salaries, and his ex-wife's and minor children's reliance on his support.  He also cites the sixty-five letters submitted on his behalf by friends, neighbors, family members, and clients describing him as generous, hard-working, and responsible.   With respect to the criminal activity itself, he

protests that the court unfairly emphasized his initial actions concealing property and failed to credit his voluntary participation in the settlement of the adversary proceeding and his payments to creditors with non-estate funds.

The district court has broad discretion to balance the pertinent sentencing factors, see 18 U.S.C. § 3553,[26] and the court is not required to give every factor equal weight. See Suárez-González, 760 F.3d at 101. Edgardo does not argue that the district court "overlooked or misapprehended relevant sentencing factors but, rather, [complains] that the court gave more weight to factors that [he] regarded as unimportant and less weight to factors that [he] regarded as salient." Id. at 102. However, making a judgment about the proper balance of factors "is precisely the function that a sentencing court is expected to perform." Id.

Indeed, the district court explained that its choice of sentence took into account the rationales Edgardo offered for a lenient sentence -- including his mother's and children's needs, the small impact of his fraud on creditors, and the letters of recommendation -- along with the countervailing need to "convey the

---

[26] Under § 3553(a), a sentencing court must "impose a sentence sufficient, but not greater than necessary," to achieve the purposes of sentencing. 18 U.S.C. § 3553(a). The factors courts should consider in determining the appropriate sentence include the nature and circumstances of the offense, the defendant's history and characteristics, and the need for the sentence to promote respect for the law and provide just punishment for the crime. Id. § 3553(a)(1), (2).

message that the laws are to be obeyed."  The court stated that, notwithstanding the mitigating factors, it "cannot overlook the seriousness of the offense, the actions of this defendant," and the apparent absence of "clear repentance or remorse" for criminal conduct that Edgardo undertook knowingly and with deliberation. The court's moderate approach is reflected in its decision to impose a sentence below the bottom of the guideline range of 87 to 108 months.[27]

In sum, the district court met its obligation to weigh the competing sentencing considerations, and it did not commit procedural error when it rejected Edgardo's differing assessment of the balance.  See Suárez-González, 760 F.3d at 101-02.

## B. Substantive Error

Edgardo also attacks his sentence as substantively unreasonable, arguing that his circumstances justify a downward departure to a sentence of probation with home confinement, yet the court imposed a term of imprisonment twice as long as his sister's. In so arguing, Edgardo depicts Astrid as the "mastermind" of the bankruptcy fraud, pointing to her legal experience and prior similar conduct in her own bankruptcy.

---

[27] The government had requested a sentence of 108 months, describing that punishment as "conservative given the egregiousness of this case, the way in which he laundered the funds, used the family members and appropriated identities for the purpose of defrauding the Federal Court."

As explained in the preceding section, however, the district court took a measured approach to the pertinent sentencing factors, and its "choice of emphasis . . . is not a basis for a founded claim of sentencing error." United States v. Ramos, 763 F.3d 45, 58 (1st Cir. 2014) (omission in original) (internal quotation marks omitted). Significantly, the court sided with Astrid in assessing the siblings' efforts to lay primary blame on the other. Pointing to Astrid's testimony that Edgardo was "the instigator [and] master mind," the court noted that she "didn't benefit or receive extra money from this, but this was all done for [Edgardo's] financial gain." The court further observed that Edgardo was not only a widely known plastic surgeon, but he also had earned a JD and thus "knew about the law." Moreover, Edgardo alone was found guilty of money-laundering, which accounted for part of the differential in the siblings' sentences.

As we have noted on multiple occasions, "[t]he linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." Ramos, 763 F.3d at 58 (internal quotation marks omitted). The district court provided both here. We therefore reject Edgardo's claim that his sentence was substantively unreasonable.

## VIII.

For the reasons that we have explained, each of appellants' claims is unavailing.  We therefore affirm their convictions and sentences.

So ordered.