**Silvestre RAMÍREZ–CARLO, et al., Plaintiffs, Appellants,**

v.

**UNITED STATES of America (Department of Veteran's Affairs), Defendant, Appellee.**

No. 06–1559.

United States Court of Appeals, First Circuit.

Heard Jan. 12, 2007.

Decided Aug. 1, 2007.

Luis M. Cháves–Ghigliotty, for appellant.

German A. Rieckehoff, Assistant united States Attorney, with whom Rosa E. Rodríguez–Vélez, United States Attorney, and Nelson Pérez–Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

Before TORRUELLA, LIPEZ, and HOWARD, Circuit Judges.

TORRUELLA, Circuit Judge.

On February 11, 1998, Silvestre Ramírez Carlo ("Ramírez"), a Korean War veteran, filed an administrative claim with the Department of Veteran Affairs (the "VA") claiming that its failure to diagnose and treat him on October 22 and 23, 1996 resulted in the need for open-heart surgery, among other injuries. This claim was settled on April 19, 1999. On March 7, 2001, Ramírez filed a second administrative claim seeking damages for injuries incurred as a result of the VA's failure to treat a coronary condition it discovered on February 10, 1995, alleging that this failure contributed to his need for the open-heart surgery. The VA denied this claim on the ground that it was untimely. Ramírez appealed the VA's decision to a federal district court. The district court granted summary judgment in favor of the VA, concluding that Ramírez's claim for failure to treat his coronary condition was time-barred. Ramírez appeals that order. After careful consideration, we reverse and remand.

## I. *Background*

On February 10, 1995, Ramírez was admitted at the San Juan VA Medical Center complaining of abdominal pain and general discomfort. He was diagnosed with appendicitis, but an appendectomy performed that day showed a normal appendix. An electrocardiogram ("EKG") performed that same day showed an inferior infarct (dead cardiac muscle tissue) and abnormalities in his heart's rhythm, which suggested a deficiency of blood supply to part of his heart. According to Ramírez, the VA did not inform Ramírez of these results. A VA doctor recommended that, after his discharge, Ramírez be given a stress test. The next day, cardiac enzyme studies showed normal results. On February 13, 1995, an infectious disease specialist examined Ramírez because he showed evidence of probable infection. That doctor recommended a battery of tests, including serial EKGs, cardiac enzyme studies, a cardiology evaluation, and an abdominal sonogram if abdominal pain persisted. On February 15, the hospital ordered an echocardiogram for a closer inspection of Ramírez's heart. On February 16, Ramírez was discharged and the hospital recommended a follow-up visit at the Surgical Clinic.

The echocardiogram ordered by the hospital was performed on May 5. It showed abnormalities in the heart's movement suggestive of a prior myocardial infarction and a mild dysfunction of the left lower chamber of the heart. On May 31, 1995, Ramírez was seen at the Surgery Clinic, and was described as doing well. He was given a follow-up appointment for November 29, 1995, but he did not keep that appointment.

On October 22, 1996, Ramírez was admitted to the Emergency Room of the Mayaguez VA Outpatient Clinic complaining of a two-week history of abdominal pain, which had worsened in the last three days. Ramírez's blood pressure was elevated, but he was described as being in no acute distress and his heart and extremities were described as "normal." Ramírez was discharged with a prescription for an antispasmodic and he was instructed to return the following day.

Ramírez returned to the Outpatient Clinic the next day, October 23, 1996, saying that he was feeling the same. His blood pressure was again high, but his abdomen was described as "normal" and the treating physicians noted again that he was not in acute distress. He was discharged with another prescription for antispasmodics. Up to this point, Ramírez had been under the VA's constant and exclusive care since 1977.

Later that day, Ramírez went to the Emergency Room at La Concepción Hospital complaining of chest pain. Ramírez's blood pressure was high and an EKG showed an old inferior wall myocardial infarction (old dead cardiac muscle tissue), as well as an acute anterior wall myocardial infarction (heart muscle tissue that was dying due to a deprivation of blood supply). He was admitted to the intensive care unit.

On October 28, La Concepción Hospital referred Ramírez to Hospital Perea for a cardiac catheterization. That test detected three partially or totally obstructed heart vessels. On October 29, Ramírez was transferred to St. Luke's Hospital where he underwent coronary bypass surgery on October 31, 1996 and was discharged on November 19, 1996.

On February 11, 1998, Ramírez filed a timely administrative claim (the "first claim") with the VA alleging that on October 22 and 23, 1996, the VA Mayaguez Outpatient Clinic failed to diagnose and treat the condition (pre-infarction angina) that caused the myocardial infarction that led to open-heart surgery on October 31, 1996. As a result of this claim, the parties engaged in settlement negotiations.[1] According to Ramírez, on March 16, 1999, during settlement negotiations, the VA informed Ramírez that the EKG performed in February 1995 showed a coronary condition that could have been treated. Ramírez claims this was the first time he had heard about those EKG results. He also claims that the parties agreed that, as a condition of settlement, the parties would "sever" the part of the claim relating to the failure to treat the coronary condition revealed by the February 1995 EKG (the "second claim"), and Ramírez would submit that claim on a later date. As evidence of that agreement, Ramírez points to a letter sent by his lawyer to the VA confirming the settlement and stating, "We are willing to sever the part of the claim which covers the damages resulting from the heart by-pass operation, and resubmit the same." It appears that the VA never responded to this letter. On April 19, 1999, Ramírez signed a Settlement Agreement for $30,000.

On March 7, 2001, Ramírez filed a second administrative claim alleging that the VA's failure to treat Ramírez's coronary condition contributed to his need for the open heart surgery. More than three years later, on May 27, 2004, the VA denied Ramírez's second claim on timeliness grounds, noting that the administrative claim was filed outside the two year period established by 28 U.S.C. § 2401(b). In its letter denying the claim, the VA indicated that during the investigation of the first claim and its subsequent settlement, it had considered Ramírez's pre-existing coronary artery disease claim and rejected it.[2]

1. In contemplation of the settlement of Ramírez's first claim, the VA wrote a report analyzing the VA's medical records, including the February 1995 EKG and the EKG taken on October 24, 1996 at La Concepción Hospital.

2. Specifically, the VA's report analyzing Ramírez's claim (written before the settlement of Ramírez's first claim) found: "(1) an old myocardial infarct and T–Wave inversion suggestive of ischemia; (2) a left ventricular ejection finding of 40%; and (3) that these findings

On December 10, 2004, Ramírez filed a complaint in federal district court against the VA for money damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671–2680, alleging that the VA's failure to treat his coronary condition amounted to medical malpractice, which resulted in his suffering a myocardial infarction that required open heart surgery. On January 13, 2006, the district court adopted Magistrate Judge Vélez–Rivé's Report and Recommendation granting summary judgment in favor of the VA on the grounds that the action was time-barred.

## II. Standard of Review

■ We review the grant of summary judgment *de novo*. *See Napier v. F/V DEESIE, Inc.*, 454 F.3d 61, 64 (1st Cir. 2006). We will reverse the lower court if, after viewing the facts and making all inferences in favor of the non-moving party, the evidence on record is "sufficiently open-ended to permit a rational fact finder to resolve the [liability] issue in favor of either side." *Coyne v. Taber Partners I*, 53 F.3d 454, 457 (1st Cir.1995); *see* Fed. R.Civ.P. 56.

## III. Discussion

■ The FTCA is a limited waiver of sovereign immunity by the United States whereby a claimant can sue for the "negligent or wrongful act or omission" of certain government employees. 28 U.S.C. § 1346(b)(1). However, "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues." § 2401(b).

The general rule is that a tort claim accrues at the time of the plaintiff's injury. *United States v. Kubrick*, 444 U.S. 111, 120, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). However, under the well-established "discovery rule" exception, a claim accrues when the plaintiff discovers, or should have discovered, the factual basis for the cause of action. *González v. United States*, 284 F.3d 281, 288 (1st Cir.2002).

Ramírez makes three arguments on appeal that his second claim is not time-barred. His first argument is that his first claim put the VA on notice of his second claim, and that therefore they were both filed on February 11, 1998. In support of his argument, Ramírez points out that the VA admitted to considering the merits of the second claim as part of its investigation of the first claim.

■ Under the FTCA, "[a]n action shall not be instituted upon a claim against the United States ... unless the claimant shall have first presented the claim to the appropriate Federal agency." 28 U.S.C. § 2675(a). This process is intended to provide sufficient notice to the United States so that it can investigate the alleged incident of negligence. *See López v. United States*, 758 F.2d 806, 809–10 (1st Cir. 1985). An agency must receive "enough information" in the claim filed in order to begin the investigation. *Santiago–Ramírez v. Sec'y of Dep't of Defense*, 984 F.2d 16, 19 (1st Cir.1993). Accordingly, the test to satisfy this requirement "is an eminently pragmatic one: as long as the language of an administrative claim serves due notice that the agency should investigate the

would have required the patient undergo a Thallium study and a catheterism since he presented evidence of coronary artery disease." The report also stated that "the outcome of this case would not have changed if the patient would have been timely treated

because the patient would have always required an open heart surgery and that said surgery would not have necessarily freed the patient from experiencing a myocardial infarction after a surgery."

possibility of particular (potentially tortious) conduct and includes a specification of the damages sought, it fulfills the notice-of-claim requirement." *Dynamic Image Tech., Inc. v. United States,* 221 F.3d 34, 40 (1st Cir.2000).

■ Ramírez's first claim did not include facts about the failure to treat his coronary condition; it made no reference to any medical treatment he did or did not receive before October 22, 1996. Rather, it was limited to "the misdiagnosis and inadequate standard of care which the veteran received on October 22 and 23, 1996." Appellant Br. 3. That set of facts could not have put the VA on notice of his second (coronary condition) claim, which is based on alleged malpractice occurring more than a year earlier. That the VA went beyond the facts stated in the first claim in preparation for settlement negotiations does not change this analysis. The test is whether the claim put the government on notice of the cause of action, not whether the government knew about the cause of action. Our inquiry, therefore, is simply whether the facts stated in the claim put the agency on notice of "particular (potentially tortious) conduct." *Dynamic Image Tech.,* 221 F.3d at 40. Here, the facts presented spoke only to the VA's conduct in failing to diagnose Ramírez's heart attack; there was simply no information about the VA's treatment (or lack thereof) of a coronary condition detected one year earlier.

■ Ramírez's second argument is that his claim was timely because, under the discovery rule, his claim did not accrue until March 16, 1999, when he learned during settlement negotiations that the February 1995 EKG showed that he had a coronary condition which the VA failed to treat. Ramírez argues that his March 7, 2001 claim was timely because it was brought within two years of the accrual date of March 16, 1999.

■ Under the discovery rule, a claim accrues when the party has knowledge of both the injury and its cause. *United States v. Kubrick,* 444 U.S. 111, 120–22, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Pursuant to this rule, "a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." *González,* 284 F.3d at 288; *see also Callahan v. United States,* 426 F.3d 444, 451 (1st Cir.2005) ("Accrual is triggered by the discovery of sufficient facts about the injury and its cause to prompt a reasonable person to inquire and seek advice preliminary to deciding if there is a basis for filing an administrative claim against the government." (internal quotation marks omitted)). "The standard is an objective one; in order to toll the statute of limitations pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of injury." *González,* 284 F.3d at 288. "Inherently unknowable" means that the factual basis is "incapable of detection by the wronged party through the exercise of reasonable diligence." *Id.* (internal quotation marks omitted).

The district court held that the coronary condition cause of action (the second claim) accrued no later than October 31, 1996 (the day of the open-heart surgery) because, by that time, Ramírez had sufficient facts to alert a reasonable person that the VA might have been negligent in the course of his treatment after the February 1995 EKG. The district court further held, in the alternative, that Ramírez was on notice of the coronary condition claim by February 11, 1998 (when the first claim was filed), because by that time, Ramírez "had already retained counsel . . . to investigate

the matter and represent [him] during the administrative proceedings."

We agree with the district court that Ramírez had sufficient information to trigger the statute of limitations clock, at the latest, on February 11, 1998, when he hired a lawyer to prosecute his first claim against the VA. On October 31, 1996, the date of Ramírez's coronary bypass surgery, Ramírez knew that he had a coronary condition, he knew that his heart's condition had deteriorated to the point that open-heart surgery was required, and he knew that he had had an EKG and an echocardiogram in 1995, which were followed by a battery of other heart-related tests. This information alone could lead a reasonable person to inquire into the care he had received at the VA in the years preceding the surgery, particularly where his medical treatment had been exclusively provided at that hospital. But even if this information was not enough, surely the hiring of legal counsel on February 11, 1998 brought Ramírez a critical step closer to facilitating the discovery of possible malpractice in the treatment he received at the VA. Once he retained legal counsel to prosecute a malpractice claim against the VA, Ramírez was armed with enough information, and now had added resources to "discover" the factual basis for a related second cause of action. "[A] plaintiff, through [his] attorneys, [bears] the responsibility of both inquiring among the medical and legal communities to determine whether [he] had an actionable claim and bringing any such claim within the statutory period." *González*, 284 F.3d at 290.

Ramírez's final argument is that his second claim should be equitably tolled because the VA allegedly agreed to the claim's "resubmission" as part of the settlement of the first claim.

Although Ramírez's appeal refers to the doctrine of equitable tolling, we construe his argument to be based on equitable estoppel.[3] The two doctrines are closely related, but distinct. Equitable tolling applies when the plaintiff is unaware of the facts underlying his cause of action, *González*, 284 F.3d at 291, while equitable estoppel applies when a plaintiff who knows of his cause of action reasonably relies on the defendant's conduct or statements in failing to bring suit, *Vistamar, Inc. v. Fagundo–Fagundo*, 430 F.3d 66, 73 (1st Cir.2005). Ramírez's claim that the VA agreed to the delayed submission of the second claim appeals to equitable principles relating to the propriety of his reliance upon the defendant's conduct. Because it is fairly clear that Ramírez's argument is based on equitable estoppel rather than equitable tolling and because the two doctrines are often used interchangeably, we treat his argument as such. *See Benítez–Pons v. Puerto Rico*, 136 F.3d 54, 61 (1st Cir.1998) ("The plaintiff's argument muddles the doctrines of equitable estoppel and equitable tolling. Because the plaintiff asserts elements of both doctrines, we will analyze the equitable arguments under both estoppel and tolling theories."); *see also Socop–González v. INS*, 272 F.3d 1176, 1185–86 (9th Cir.2001) ("Courts themselves often 'use the terms "equitable tolling" and "equitable estoppel" interchangeably or incorrectly.' ").

**3.** "The doctrine of equitable tolling suspends the running of the statute of limitations if a plaintiff, in the exercise of reasonable diligence, could not have discovered information essential to the suit." *González,* 284 F.3d at 291; *Bernier v. Upjohn Co.,* 144 F.3d 178, 180 (1st Cir.1998). As noted above, Ramírez cannot make the required showing of due diligence with respect to the discovery of his cause of action, and therefore he is not entitled to equitable tolling.

In *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 95–96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court held that there is a "rebuttable presumption" that equitable tolling is a defense to all statutes of limitations in suits against the government. However, this court has not explicitly extended *Irwin*'s holding to equitable estoppel. *See Berman v. United States*, 264 F.3d 16, 19–20 (1st Cir.2001). However, the Supreme Court itself in *Irwin* treated equitable estoppel as a form of equitable tolling when it cited an equitable estoppel case to support the proposition that "[the Court has] allowed equitable tolling in situations where ... the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin*, 498 U.S. at 96, 111 S.Ct. 453 (citing *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 79 S.Ct. 760, 3 L.Ed.2d 770 (1959) (applying equitable estoppel where adversary's misrepresentation caused plaintiff to let filing period lapse by "representing to [plaintiff] that he had seven years in which to sue")); *see also Goodhand v. United States*, 40 F.3d 209, 213–14 (7th Cir.1994) ("*Irwin* explicitly (albeit in dictum) treats equitable estoppel as a form of equitable tolling." (parenthetical in original)). Moreover, we see no reason for distinguishing between equitable tolling and estoppel as defense to the FTCA's statute of limitations. Courts of appeals that have addressed whether equitable estoppel is a defense to the FTCA's statute of limitations have assumed that it is. *See, e.g., Goodhand*, 40 F.3d at 213–14; *Lehman v. United States*, 154 F.3d 1010, 1017 (9th Cir.1998); *see also Winter v. United States*, 93 Fed.Appx. 145, 145 (9th Cir. 2004) (unpublished opinion) (holding that the government was equitably estopped from asserting a statute of limitations defense because the VA engaged affirmative misconduct). Thus, we hold that equitable estoppel may be invoked against the government in a claim under the FTCA.

In *Heckler v. Community Health Services*, the Supreme Court explained that a party seeking to assert equitable estoppel must demonstrate that (1) the party to be estopped made a "definite misrepresentation of fact to another person having reason to believe that the other [would] rely upon it"; (2) the party seeking estoppel relied on the misrepresentations to its detriment; and (3) the "reliance [was] reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984) (quoting Restatement (Second) of Torts § 894(1)(1974)); *see also Benítez–Pons*, 136 F.3d at 63; *Clauson v. Smith*, 823 F.2d 660, 661–62 (1st Cir.1987). In addition, a party seeking estoppel against the government must show that the government engaged in affirmative misconduct. *Dantran v. U.S. Dep't. of Labor*, 171 F.3d 58, 67 (1st Cir.1999). While there is no settled test for what constitutes "affirmative misconduct," it requires more than simple negligence. *Id.* "Affirmative misconduct ... require[s] an affirmative misrepresentation or affirmative concealment of a material fact by the government, although it does not require that the government intend to mislead a party." *Watkins v. U.S. Army*, 875 F.2d 699, 707 (9th Cir. 1989) (en banc) (internal quotation marks and citations omitted).

Ramírez argues that the VA should be estopped from raising a statute of limitations defense because it allegedly agreed to "sever" the second claim and allow its submission at a later date. As evidence of this allegation, Ramírez points to a letter sent by his attorney to the VA "confirming" that as part of the settlement of the first claim, the parties had agreed "to sev-

er [the second claim], and resubmit the same." Sometime thereafter, the first claim was settled. There is no evidence in the record of a response from the VA to this letter, nor is there a copy of the actual settlement agreement in the record.

The question for us then is whether the letter and the subsequent settlement are enough to establish a claim for equitable estoppel on summary judgment.[4] We think they are. Looking at the evidence in the light most favorable to Ramírez, a reasonable fact finder could infer that the VA did, in fact, agree to the late submission from the letter's language that it was written "to confirm [the parties'] negotiations and disposition," from the lack of response from the VA to the contrary, and from the fact that the claim was ultimately settled. A reasonable fact finder could also find that the agreement was an affirmative misrepresentation given that the VA later disavowed any agreement, denying the claim more than three years after it was received because "the medical care and treatment and the alleged adverse results there from [sic] occurred more than

three years prior to receipt of the claim." Finally, these facts also support a reasonable fact finder's conclusion that the VA had reason to believe that Ramírez would rely on the agreement, and that Ramírez's reliance was reasonable because of the letter's allusions to an earlier agreement between the parties as well as the subsequent settlement between the parties.[5]

## IV. Conclusion

For the reasons stated above, we reverse the district court's summary judgment order and remand for further proceedings consistent with this opinion.

### *Reversed and remanded.*

---

4. To properly understand this theory, several facts and assumptions must be made explicit. Ramírez's open-heart surgery (his claimed injury for both claims) took place on October 31, 1996. We hold that the second claim accrued, *at the latest,* on February 11, 1998, when Ramírez hired an attorney to prosecute his first claim. The first claim settled on April 19, 1999—more than two years after his injury, but a little less than a year before the statute of limitations (under our holding) ran out on his second claim. However, to the extent there was an agreement on an extension of the statute of limitations, it is reasonable to assume that both parties understood the accrual date to be the date of the injury (October 1996), rather than the date of the hiring of the attorney (February 1998), because the general rule is that a tort claim accrues at the time of the plaintiff's injury. *See Skwira v. United States,* 344 F.3d 64, 73 (1st Cir.2003). Thus, it is reasonable that both parties would see the need for an exten-

sion of time. The equitable estoppel theory, then, is (a) that the letter of March 26, 1999 is evidence of an earlier agreement between the parties that the second claim could be submitted at a later date, and (b) that by receiving the letter, settling the claim, and never expressing disagreement with the letter's content, the government misled Ramírez.

5. We emphasize that these conclusions are only drawn for the purposes of summary judgment, when we are required to view the evidence in the light most favorable to Ramírez, and draw all inferences in his favor. *See In re Varrasso,* 37 F.3d 760, 764 (1st Cir.1994) ("[W]hen facts, though undisputed, are capable of supporting conflicting yet plausible inferences—inferences that are capable of leading a rational factfinder to different outcomes in a litigated matter depending on which of them the factfinder draws—then the choice between those inferences is not for the court on summary judgment.").