# In the United States Court of Federal Claims

No. 23-704C
(Filed: December 11, 2024)
**FOR PUBLICATION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ORVILLE NIX, JR., | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Thomas L. Halkowski*, Fish & Richardson P.C., Washington, D.C., for Plaintiff. With him on briefs were *Kurt L. Glitzenstein* and *Daniel H. Wade*, Fish & Richardson P.C., Boston, MA.

*Borislav Kushnir*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for Defendant. With him on briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, *Patricia M. McCarthy*, Director, and *Elizabeth M. Hosford*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Jeffrey Landou*, Associate General Counsel, National Archives and Records Administration, Washington, D.C.

## OPINION AND ORDER

Plaintiff Orville Nix, Jr.[1] seeks just compensation under the Fifth Amendment for an alleged taking of property: namely, a long-missing film of the assassination of President John F. Kennedy. Am. Compl. (ECF 39). The government moved to dismiss, arguing that Plaintiff has failed to plead facts sufficient to state a takings claim within this Court's statute of limitations.[2] Those arguments fail — at least at the pleadings stage — so the motion to dismiss is **DENIED**.

---

[1] ONF Enterprises, LLC, was the original Plaintiff in this action. Compl. (ECF 1). ONF later moved for leave to file an amended complaint substituting Mr. Nix, *see* Unopp. Mot. for Leave (ECF 35), and I granted the motion, *see* Order (ECF 38). I refer to Mr. Nix as "Plaintiff" throughout this opinion.
[2] Mot. to Dismiss (ECF 9); *see also* Pl.'s Resp. (ECF 12); Def.'s Reply (ECF 16). I held oral argument on the motion. *See* Tr. (ECF 21). After argument, both parties submitted supplemental briefing. Def.'s Supp. Br. (ECF 28); Pl.'s Supp. Br. (ECF 30).

## BACKGROUND

The Amended Complaint alleges the following relevant facts, which I take as true.[3] *A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Orville Nix, Sr., Plaintiff's father, filmed the assassination of President Kennedy in November 1963. Am. Compl. ¶ 7. That recording — known as the "Nix film" — was from an angle opposite the more famous Zapruder film. The Nix film thus captures Abraham Zapruder and the area around him, where some claim a gunman other than Lee Harvey Oswald was hiding. *See* Am. Compl. ¶¶ 11, 21.

Two weeks after the assassination, Mr. Nix, Sr., licensed the original Nix film to United Press International ("UPI") for a term of twenty-five years. Am. Compl. ¶ 13. In 1978, unbeknownst to him, UPI transferred the Nix film to the United States House of Representatives Select Committee on Assassinations ("HSCA"). Am. Compl. ¶¶ 35–40. The HSCA sent the Nix film to the Aerospace Corporation in California to be scanned and enhanced, Am. Compl. ¶ 44, but incorrectly recorded that the Nix film was sent to a laboratory in Los Alamos instead, Am. Compl. ¶ 46. There are no records suggesting that the Nix film was ever returned to the HSCA, Am. Compl. ¶¶ 50–55, nor that the HSCA ever returned the film to UPI, Am. Compl. ¶¶ 48–69.

Mr. Nix, Sr. died while the license to UPI was in effect, and his interest in the Nix film passed to Plaintiff. Am. Compl. ¶¶ 25–26. In 1988, when UPI's license period was about to end, Gayle Nix Jackson, Plaintiff's daughter, asked UPI to return the Nix film. Am. Compl. ¶ 27. UPI informed Ms. Jackson that it did not have the film and believed that it was in the possession of the National Archives and Records Administration ("NARA"). Am. Compl. ¶ 28. When Ms. Jackson sought to recover the Nix film from NARA, however, the agency informed her that it did not have the original Nix film, only a copy. Am. Compl. ¶¶ 31–32. After Ms. Jackson contacted Senator Phil Gramm to ask for his help recovering the Nix film, NARA gave him the same response. Am. Compl. ¶¶ 33–34; Am. Compl. Ex. 41 (ECF 39-41). Plaintiff alleges that Ms. Jackson continued to search for the Nix film "exhaustively and diligently" for many years afterward and that the government "repeatedly and consistently" denied that it possessed the film. Am. Compl. ¶¶ 89–90.

On October 26, 1992, while Ms. Jackson's search efforts were in progress, the President John F. Kennedy Assassination Records Collection Act of 1992 ("JFK Records Act") went into effect. *See* Am. Compl. ¶ 94; Pub. L. No. 102-526, 106 Stat.

---

[3] The government does not challenge the truth of any allegations in the Amended Complaint. Tr. at 26.

3443. The JFK Records Act says that all "assassination records"[4] held by federal government agencies were to be transmitted to NARA, which would create a collection that "shall be available to the public for inspection and copying at the National Archives." JFK Records Act § 4(b); *see* Am. Compl. ¶ 97. NARA was required to release all assassination records in its possession — with exceptions not relevant here[5] — by October 26, 2017. JFK Records Act § 5(g)(2)(D).

In 2014, as part of her ongoing search, Ms. Jackson contacted G. Robert Blakey, one-time chief counsel for the HSCA. Am. Compl. ¶¶ 57, 100. Mr. Blakey confirmed that the HSCA did take possession of the original Nix film — not a copy, as Ms. Jackson had previously thought, *see* Am. Compl. ¶¶ 101–02; Pl.'s Resp. at 3 — and that the HSCA provided its chain of custody information to NARA. Am. Compl. ¶ 102; Am. Compl. Ex. 25 ¶ 7 (ECF 39-25). Ms. Jackson then sent NARA a request under the Freedom of Information Act for information related to the Nix film. Am. Compl. ¶ 103. An archivist at NARA told Ms. Jackson that his "understanding has always been that the Nix original was lost while in the custody of UPI." Am. Compl. Ex. 26 (ECF 39-26); Am. Compl. ¶ 103.

In 2015, Ms. Jackson sued the United States and NARA in the United States District Court for the District of Columbia, seeking either replevin under the Federal Tort Claims Act or compensation under the Takings Clause. Am. Compl. ¶ 104; Am. Compl. Ex. 27 (ECF 39-27). The district court dismissed the case in 2017 for lack of subject matter jurisdiction, holding that Ms. Jackson had failed to exhaust administrative remedies before bringing the replevin claim and that the takings claim should properly be heard in this Court instead. Am. Compl. Ex. 29 at 4–6 (ECF 39-29) (*Jackson v. United States*, 248 F. Supp. 3d 167, 172 (D.D.C. 2017)).

Soon after the district court's decision, NARA released "thousands of assassination records" as required by the JFK Records Act. Am. Compl. ¶ 108. The Nix film was not among them. Am. Compl. ¶ 109.

Plaintiff and Ms. Jackson later engaged counsel to assist in their search for the Nix film. Am. Compl. ¶ 114. Counsel confirmed that (1) UPI's successors in interest did not have the Nix film, Am. Compl. ¶ 117, and (2) UPI sent the HSCA the original

---

[4] The JFK Records Act defines an "assassination record" as "a record that is related to the assassination of President John F. Kennedy, that was created or made available for use by, obtained by, or otherwise came into the possession of" listed entities including the HSCA or NARA, *see* JFK Records Act § 3(2)(E), (G), with an exception not relevant here. The term "record" includes "sound or video recording[s]." JFK Records Act § 3(11).

[5] The JFK Records Act permits the President to exclude certain records from disclosure for reasons of law enforcement and national security. JFK Records Act § 5(g)(2)(D)(i). But that exception does not extend to records — like the Nix film — originally created by persons outside the government, all of which must be released without exception. JFK Records Act § 5(a)(4).

Nix film, not a copy, Am. Compl. ¶ 119. Counsel then contacted the Aerospace Corporation, the government contractor that took possession of the film from the HSCA. *Id.* On May 12, 2021, Aerospace informed Plaintiff's counsel that it had sent the Nix film to NARA in 1978, not back to the HSCA or UPI. Tr. at 45; Am. Compl. ¶¶ 47, 120.

Plaintiff's counsel then turned the search back to NARA, asking the agency to take measures to preserve the Nix film and to produce various documents associated with the film. NARA denied the request for emergency preservation and did not produce the majority of the documents requested. Am. Compl ¶¶ 121–29. NARA ultimately produced documents including the HSCA photo control log, which appeared to show that the Nix film had been sent by HSCA to Aerospace, but which did not show that it had been returned. Am. Compl ¶¶ 130–32.

Those documents, together with the information received from Aerospace, lead Plaintiff to allege that NARA has had the Nix film all along. Am. Compl. ¶ 133.

## DISCUSSION

Plaintiff alleges that the JFK Records Act effected a taking of the Nix film by permanently transferring possession to the government. Am. Compl. ¶¶ 172–77. That claim raises a host of issues, some of which were overlooked or barely addressed by the parties. The major questions at this stage are (1) whether the statute of limitations has run, (2) whether Plaintiff has standing to assert a takings claim, and (3) whether the JFK Records Act appropriates property as Plaintiff argues.

## I. Jurisdiction

The Tucker Act provides this Court with jurisdiction over claims for money based on (1) contracts between the plaintiff and the United States, (2) illegal exactions of money by the United States, or (3) laws or constitutional provisions that require the United States to pay money to the plaintiff (commonly called "money-mandating" laws). *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (citing 28 U.S.C. § 1491(a)(1)); *Spencer v. United States*, 98 Fed. Cl. 349, 355 (2011). The Takings Clause is money-mandating, *Jan's Helicopter Serv., Inc. v. F.A.A.*, 525 F.3d 1299, 1309 (Fed. Cir. 2008), so this Court has subject-matter jurisdiction over takings claims like Plaintiff's. That leaves two jurisdictional issues to be resolved: the statute of limitations and standing.

### A. Statute of Limitations

The Tucker Act imposes a general six-year statute of limitations on suits brought before this Court. 28 U.S.C. § 2501. That period is jurisdictional and cannot be tolled. *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136 (2008). The

Nix film has not been in the possession of Plaintiff or his father for over sixty years, and the JFK Records Act, which allegedly effected the taking, became law more than three decades ago. The government therefore argues that even if a taking occurred, the statute of limitations has expired. Def.'s Reply at 8–10. Plaintiff responds that although the Nix film was taken long ago, he was not on notice of the taking until May 2021, and that his claim therefore did not accrue until then. Pl.'s Supp. Br. at 5–10. I agree with Plaintiff, at least for purposes of the pleadings stage.

Physical takings claims (like this one)[6] typically accrue "when the taking action occurs." *Navajo Nation v. United States*, 631 F.3d 1268, 1273–74 (Fed. Cir. 2011) (quoting *Goodrich v. United States*, 434 F.3d 1329, 1333 (Fed. Cir. 2006)) (alteration omitted); *see also Knick v. Twp. of Scott, Pa.*, 588 U.S. 180, 189 (2019) ("[A] property owner has a claim for a violation of the Takings Clause as soon as a government takes his property for public use without paying for it."). When a physical taking results from a statute, the taking occurs when the act was adopted. *Ute Indian Tribe of the Uintah & Ouray Rsrv. v. United States*, 99 F.4th 1353, 1372 (Fed. Cir. 2024); *see also Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1570 (Fed. Cir. 1993). In this case, the relevant date is October 26, 1992, when the JFK Records Act went into effect. Am. Compl. ¶ 94; Def.'s Supp. Br. at 6–7. Plaintiff's suit, filed on May 11, 2023, would typically be far outside this Court's jurisdiction.

In some circumstances, however, claims do not accrue until after the taking occurred: specifically, when plaintiff's "injury was inherently unknowable at the accrual date[]" or when "the defendant has concealed its acts with the result that plaintiff was unaware of their existence[.]" *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008) (quotes omitted). Formulations referring to "inquiry notice," the date an injured party "knew or should have known" of a claim, or claims that are "concealed or inherently unknowable" are all different ways of describing the same test. *See, e.g.*, *Holmes v. United States*, 657 F.3d 1303, 1319–21 (Fed. Cir. 2011).

"The Court's inquiry into a claim's accrual under the statute of limitations is highly fact-specific." *Otay Mesa Prop. L.P. v. United States*, 86 Fed. Cl. 774, 786 (2009), *aff'd*, 670 F.3d 1358 (Fed. Cir. 2012). "[D]iscovery of the injury, not discovery

---

[6] Cases distinguish physical takings, where the government appropriates an interest in property for itself, from regulatory takings, where legal restrictions on a property's use are analogous to an outright seizure. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021). Some cases could be read to say that physical appropriations of property should be treated as regulatory takings when they are accomplished by regulation. *See, e.g.*, *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 365 (4th Cir. 2020) ("Thus, when a regulation authorizes a third party to physically take property, that regulation effects a per se regulatory taking."). But *Cedar Point* makes clear that "[g]overnment action that physically appropriates property is no less a physical taking because it arises from a regulation." *Cedar Point*, 594 U.S. at 149.

of other elements of a claim, is what starts the clock." *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 461 (2007) (citing *Rotella v. Wood*, 528 U.S. 549, 555 (2000)). That means that a claim accrues when diligent investigation would have revealed that a party has a claim to bring. *See Patton v. United States*, 64 Fed. Cl. 768, 774 (2005); *Mitchell v. United States*, 10 Cl. Ct. 63, 67, *modified*, 10 Cl. Ct. 787 (1986), *decision supplemented*, 13 Cl. Ct. 474 (1987). By the same token, when a claim is incapable of detection by the plaintiff through the exercise of reasonable diligence, the claim does not accrue. *Petro-Hunt, LLC v. United States*, 90 Fed. Cl. 51, 61–62 (2009), *aff'd*, 862 F.3d 1370 (Fed. Cir. 2017) (citing *Ramirez-Carlo v. United States*, 496 F.3d 41, 47 (1st Cir. 2007)); *see also Holmes*, 657 F.3d at 1320–21.

With that in mind, two considerations call for delaying accrual until 2021.

First, it appears — at least for purposes of the pleadings stage — that Plaintiff was not actually aware until May 12, 2021 that NARA received the Nix film.[7] *Compare Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1031 (Fed. Cir. 2012) (no delay in accrual for plaintiff that had actual knowledge); *Blackfeet Hous. v. United States*, 106 Fed. Cl. 142, 149 (2012), *aff'd*, 521 F. App'x 925 (Fed. Cir. 2013). Plaintiff alleges that he was unaware that the government still had possession of the Nix film until he was informed that Aerospace had sent the film to NARA. *See, e.g.*, Am. Compl. ¶¶ 118, 120.

Some facts in the pleadings are potentially inconsistent with that conclusion. In particular, Plaintiff and his family allegedly demanded that the government turn over the Nix film on several occasions before 2021, including through district court litigation. *See, e.g.*, Am. Compl. ¶¶ 30, 33, 103–04. Those events could, as the government contends, support an inference that Plaintiff knew the Nix film was in the government's possession. *See* Def.'s Reply at 9–12; Def.'s Supp. Br. at 8–10. But when (as here) the government does not contest any of the facts alleged in a complaint, *see* Tr. at 26, all reasonable inferences must be drawn in favor of the plaintiff. *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

Besides, it is possible to draw other inferences from the facts the government emphasizes. Plaintiff and his family may, as part of searching for the Nix film, have made requests without actually knowing where the film was. *See* Tr. at 56–61. In fact, Plaintiff also allegedly sent requests for return of the Nix film to UPI and its successors, Am. Compl. ¶¶ 27, 116–17; Am. Compl. Ex. 1 (ECF 39-1); Am. Compl. Ex.

---

[7] When a motion to dismiss "challenges the factual basis for this Court's subject-matter jurisdiction, the allegations in the complaint are not controlling, and the Court may review evidence outside the pleadings[.]" *L-3 Commc'ns*, 79 Fed. Cl. at 459 (citing *Cedars-Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1583–84 (Fed. Cir. 1993)). But here, as mentioned above, the government does not contest any of the facts alleged in the Amended Complaint. Tr. at 26.

44 (ECF 39-44), which is logically inconsistent with an inference that Plaintiff knew who had the film. Even Gayle Nix Jackson's complaint in the district court lawsuit was ambiguous in its allegations about where the Nix film was located. *See* Am. Compl. Ex. 27 ¶ 6 ("The HSCA was last in possession of the original Nix film in 1978 and its whereabouts since has been a mystery."). I must therefore infer from the pleaded facts that Plaintiff did not know that the government was in possession of the Nix film until 2021. Plaintiff's actual, subjective knowledge may be a question for resolution on the merits.

Second, I cannot infer that Plaintiff *should* have known that the government has the Nix film or could have found out through a more diligent search. *Compare State v. United States*, 173 Fed. Cl. 91, 104–05 (2024); *Blackfeet Hous.*, 106 Fed. Cl. at 149 ("[T]he binding precedent of this circuit does not require actual knowledge; rather, the standard is whether plaintiff was or should have been aware of the material facts underlying the claim."). Plaintiff alleges, in great detail, his family's efforts to locate the Nix film in the years leading up to 2021. *See* Am. Compl. ¶¶ 27 (demanding the Nix film back from UPI), 30 (sending a demand letter to NARA), 33 (asking Senator Gramm to send a demand letter to NARA), 70 (hiring a former HSCA employee to assist them and questioning several figures known to have dealt with the Nix film), 101 (contacting the HSCA's former counsel), 103 (sending a FOIA request to NARA), 104 (suing NARA). Those facts support an inference that Plaintiff tried diligently to locate the Nix film. Although Plaintiff is charged with awareness of publicly available information that could have put him on notice of the claim, *State*, 173 Fed. Cl. at 105, I cannot infer from the pleadings that he should have been aware of relevant facts any sooner.

The pleadings support an inference not only that Plaintiff was diligent in his efforts to find the Nix film, but that the government concealed its possession. *See L-3 Commc'ns*, 79 Fed. Cl. at 462–63 (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239 (Fed. Cir. 2002)). Every time the Nix family demanded the Nix film back from the government, the government unequivocally denied having it, including once in a signed document filed in federal court. *See* Am. Compl. ¶¶ 31, 34, 103, 105. Assuming, as I must, that NARA has had the Nix film all along, the government's denials were false. Those facts imply that the government concealed the Nix film's whereabouts from the Plaintiff. *See Holmes*, 657 F.3d at 1320–23. At the very least I cannot infer — from the pleadings alone — that Plaintiff should have known the government had the Nix film when the government repeatedly denied having it.

## B. Standing

As mentioned above, the original plaintiff in this case was not Mr. Nix but a corporation called ONF Enterprises, which acquired all rights to the Nix film in 2021 — almost 30 years after the JFK Records Act went into effect. *See* Compl. ¶ 26; Am. Compl. ¶ 26; Tr. at 85. Ordinarily, claims for just compensation belong to the party that owned the property when it was taken, not to parties with later-arising interests. *See, e.g., Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001); *Reoforce, Inc. v. United States*, 853 F.3d 1249, 1263 (Fed. Cir. 2017).[8] Counsel for ONF were not aware of that rule when I raised it at oral argument. Tr. at 84–85. Afterward, ONF amended the complaint to allege a "*nunc pro tunc*" recission of the acquisition and to substitute Plaintiff. Am. Compl. ¶ 26; Am. Compl. Ex. 38 (ECF 39-38). That raises as many questions as it answers, but I conclude that Plaintiff has adequately alleged that he is the correct party.

The parties do not explain what it means to rescind a transfer of property *nunc pro tunc*. Plaintiff alleges that as a historical fact, he was not the owner of the Nix film for some time. If Plaintiff needs to have been the real owner during that period in order to sue the government now, it is not clear how an after-the-fact agreement with ONF could help him. The parties certainly do not show how a *nunc pro tunc* rescission might relate to the rule against transfers of claims for just compensation. Maybe these mysteries have answers, but the briefs do not reveal any.

Be that as it may, the Amended Complaint and its exhibits suggest a plausible inference that the original transfer to ONF took place a few days after May 12, 2021, when Plaintiff received firm indications that the Nix film had been sent to NARA. *See* Am. Compl. Ex. 38; Tr. at 85. It therefore appears plausible that Plaintiff owned the film both when the JFK Records Act went into effect and at the latest alleged date when the claim could have accrued.[9] If not for the transfer to ONF, Plaintiff would have been the correct party in interest all along.

So what to make of the transfer to ONF and the *nunc pro tunc* recission? The parties, once again, provide little help. But authorities show that when an interest in property has been taken, the owner at the time of the taking can still seek

---

[8] Whether the correct party has brought a takings claim goes to standing, a jurisdictional issue this Court must address *sua sponte* if necessary. *State v. United States*, 146 Fed. Cl. 693, 699–700 (2020) (holding that only plaintiffs with a sufficient property interest to establish a takings claim had standing); *see also Fuji Photo Film Co. v. Int'l Trade Comm'n*, 474 F.3d 1281, 1289 (Fed. Cir. 2007) ("Because Article III standing is jurisdictional, this court must consider the issue sua sponte even if not raised by the parties.").

[9] As a result, I need not discuss whether Plaintiff would have standing if he was the owner at the time of the JFK Records Act but had transferred it when evidence of NARA's possession developed. That question may become relevant on the merits, depending on the timeline developed by the parties.

compensation after a sale. *See Kindred v. Union Pac. R. Co.*, 225 U.S. 582, 597 (1912); *Reoforce*, 853 F.3d at 1263; *Hansen v. United States*, 65 Fed. Cl. 76, 129–30 (2005); *see also* Rebecca Hansen & Lior Jacob Strahilevitz, *Toward Principled Background Principles in Takings Law*, 10 Tex. A&M L. Rev. 427, 468 (2023) ("The party that owned the land when the physical taking occurred, however, may challenge the regulation after they have already sold the land, assuming a suit is not barred by the statute of limitations."). Plaintiff would therefore be the proper party, entitled to sue, even if ONF still owned the Nix film now. The transfer and recission are red herrings.

That makes sense, because — given the standing rule — allowing transferees like ONF to sue would risk economic windfalls for property buyers. The ordinary measure of just compensation when the government takes a partial interest in property is the difference between the property's market value before and after the taking. *See, e.g.*, *United States v. Va. Elec. & Power Co.*, 365 U.S. 624, 635 (1961); *Herring v. United States*, 142 Ct. Cl. 695, 697 (1958); *Agapion v. United States*, 167 Fed. Cl. 761, 776 (2023), *appeal dismissed sub nom. Burger v. United States*, No. 2024-1249, 2024 WL 1092511 (Fed. Cir. Mar. 13, 2024). Changes in market price, though, are negotiated at the time of sale. *See Banks v. United States*, 88 Fed. Cl. 665, 681–82 (2009); *see also Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 474 (1973) (discussing valuation of property that had been improved). Under the standard rule, once an interest in a property has been taken, whoever buys the property acquires only what remains — and presumably pays the seller a lower price as a result. *Banks*, 88 Fed. Cl. at 682; *see also* Gregory M. Stein, *Who Gets the Takings Claim? Changes in Land Use Law, Pre-Enactment Owners, and Post-Enactment Buyers*, 61 Ohio St. L.J. 89, 105–06 (2000). Allowing the buyer to obtain compensation from the government would thus amount to double recovery: *i.e.*, buying a partial property interest at a discount, but ending up in possession of the total value that the complete property had before. *See Tan Phu Cuong Inv. LLC v. King Cnty.*, 831 F. App'x 235, 237 (9th Cir. 2020); *Brooks Inv. Co. v. City of Bloomington*, 232 N.W.2d 911, 918 (Minn. 1975); *see also* Stein, *supra*, 61 Ohio St. L.J. at 105 (noting that allocating the takings claim to the buyer would also be fair "as long as the parties know what the law is in advance"). The buyer, in other words, is already whole at the time of purchase, although the seller has still suffered an economic loss that can be compensated under the Takings Clause.

The net result is that even though the wrong property owner originally sued, and even though Plaintiff combined a substitution of parties with an unexplained and likely pointless legal fiction, we have somehow blundered into the right place, with the correct party pursuing his own claims.

## II. Merits

The government's other main argument is that even taking all allegations in the Amended Complaint as true, Plaintiff's claim fails on the merits because the JFK Records Act did not effect any taking of property — it only authorizes the acquisition of property by the government. Def.'s Reply at 4–8; Def.'s Supp. Br. at 2–6. That argument for dismissal presents a pure issue of law. *See Ricks v. United States*, 278 F.3d 1360, 1363 (Fed. Cir. 2002). I reject it, based on the text of the statute.

A physical taking occurs when "the government physically takes possession of an interest in property for some public purpose[.]" *Tahoe-Sierra Pres. Council v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (citing *United States v. Pewee Coal Co.*, 341 U.S. 114, 115 (1951)). Even when the government does not formally take title to property, if the government acquires one of the rights that makes up a property owner's metaphorical bundle of sticks, it has taken a cognizable property interest and must pay compensation. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147–50 (2021); *see also King v. United States*, 159 Fed. Cl. 450, 462 (2022); *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1376–77 (Fed. Cir. 2004). The Supreme Court has held that depriving an owner of "the rights to possess, use, and dispose of" personal property is a taking. *Horne v. Dep't of Agric.*, 576 U.S. 350, 360 (2015) (quoting *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)).

The JFK Records Act, as mentioned above, directs NARA to create a "collection of records" relating to the assassination of President Kennedy. JFK Records Act § 4(a)(1), (b). That direction includes all assassination records that were in NARA's possession when the law went into effect, JFK Records Act § 4(a)(2)(A)(i), as well as assassination records held by other agencies, with exceptions not relevant here. JFK Records Act § 5(c). The collection includes assassination records created by private individuals that came into the government's possession. *Id.* In the past, NARA has asserted authority to seize assassination records held by state governments or private citizens. *In re Connick*, 124 F.3d 718, 719 (5th Cir. 1997).

The Amended Complaint alleges that NARA has possessed the Nix film since 1978, Am. Compl. ¶¶ 173–75, a fact I must take as true. *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013).[10] Assuming Aerospace

---

[10] The government speculates, without any basis in the pleadings, that the Nix film might have left NARA's possession after 1978. Tr. at 31. At the pleadings stage, unsupported hypotheticals like that carry no weight. *See Bd. of Supervisors of Issaquena Cnty., Miss. v. United States*, 84 F.4th 1359, 1364 (Fed. Cir. 2023) (reviewing a dismissal for failure to state a claim, courts will "presume that the facts are as alleged in the complaint, and make all reasonable inferences in favor of the plaintiff") (quoting *Cary v. United States*, 552 F.3d 1373, 1376 (Fed. Cir. 2009)).

transmitted the Nix film to NARA in 1978, the Nix film would have been part of the collection required by statute. JFK Records Act § 4(a)(2)(A)(i).

Once collected by NARA, assassination records generally must be disclosed to the public. JFK Records Act § 5. But the law makes no provision for *return* of any privately created records to their creators. The government in fact conceded at argument that if the Nix film is part of the NARA collection created under the JFK Records Act, it will never be handed back. Tr. at 10–11, 13.[11] If the Nix film was in fact in NARA's possession when the JFK Records Act went into effect, possession was permanently transferred to the government by operation of law — a classic example of a taking. *See Horne*, 576 U.S. at 361–62 ("The Government's actual taking of possession and control of [property] gives rise to a taking as clearly as if the Government held full title and ownership.") (quotes omitted).

The government's counterargument hinges on contrasting the Nix film with the process by which the government compensated the owners of the Zapruder film, another recording of President Kennedy's assassination. Def.'s Supp. Br. at 3–4.[12] In taking the Zapruder film, the government engaged in a dispute resolution procedure with the original owners. Def.'s Supp. Br. at 3–4; Tr. at 19. The government argues that the absence of such a process for the Nix film indicates that no taking occurred. That is a non sequitur, of course: Courts often recognize that the government has taken property without any formal process at all. *See, e.g.*, *United States v. Dow*, 357 U.S. 17, 23 (1958) (holding that a taking occurred when the United States entered into possession of the land, not when it later filed to acquire title); *Davis v. United States*, 164 Ct. Cl. 612, 665 (1964) (holding that frequent and continuous government overflights constituted a taking); *Ark. Game & Fish Comm'n v. United States*, 736 F.3d 1364, 1372 (Fed. Cir. 2013) ("In order for a taking to occur, it is not necessary that the government intend to invade the property owner's rights, as long as the invasion that occurred was the foreseeable or predictable result of the government's actions.") (quotes omitted). The real question is always whether the government has taken an interest in property. *See Ark. Game & Fish Comm'n*, 736 F.3d at 1372; *Davis*, 164 Ct. Cl. at 665. The absence of a process says nothing about that question.

---

[11] The government suggests that NARA, if it found privately owned assassination records in its possession, could choose whether to retain them or release them to their owners. But the government points to nothing in the JFK Records Act to support that interpretation. Tr. at 88–90.

[12] The government also contrasts the JFK Records Act with another law that includes more explicit provisions for acquiring title to records and compensating their owners. *See* Mot. to Dismiss at 18–19; (discussing Public Law 89-318). The fact that statutes sometimes take property interests explicitly does not relieve courts of their obligation to consider whether other statutes do so implicitly. *See, e.g.*, *Cedar Point*, 594 U.S. at 152 (holding that a regulation limiting the right to exclude conducted a physical taking).

In any event, the government points to nothing in the JFK Records Act that required it to engage in any process with private owners of assassination records before permanently archiving their property. Instead, the government has in the past taken the position that private records held by NARA when the JFK Records Act went into effect could not be returned to their owners whether compensation had been paid or not. *See* John R. Tunheim *et al.*, Final Report of the Assassination Records Review Board 137 (1998). The government's decision to pay compensation for the Zapruder film says nothing about Plaintiff's right to compensation here.

## CONCLUSION

Because the Amended Complaint properly alleges a compensable taking under the Takings Clause, and because the Amended Complaint permits an inference that the suit was timely brought by the correct party, the motion to dismiss is **DENIED**.

**IT IS SO ORDERED**.

s/ Stephen S. Schwartz
STEPHEN S. SCHWARTZ
Judge